## WILLIAMS v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEVADA.

No. 157. Argued January 21, 22, 1891. — Decided March 2, 1891.

If, through inadvertence and mistake, a wrong description is placed in a conveyance of real estate by an individual, a court of equity would have jurisdiction to interfere and restore to the party the title which he never intended to convey; and it has a like jurisdiction, when a wrong description from a like cause gets into a patent of public land.

If the allegations of a bill point to fraud and wrong, and equally to inadvertence and mistake, and the latter be shown, the bill is sustainable, although the former charge may not be fully established.

The provision in the second section of the act of June 16, 1880, 21 Stat. 287, c. 245, requiring the approval of the Secretary of the Interior to the act of the state authorities of Nevada in selecting lands under the grant made by that act, while it did not vest in him an arbitrary authority, to be exercised at his discretion, empowered him to withhold his approval when it became necessary to do so, in order to prevent such a monstrous injustice as was sought to be accomplished by these proceedings.

On June 16, 1880, Congress passed an act, of which the following are the first two sections:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That there be, and are hereby, granted to the State of Nevada two million acres of land in said State in lieu of the sixteenth and thirty-sixth sections of land heretofore granted to the State of Nevada by the United States: *Provided*, That the title of the State and its grantees to such sixteenth and thirty-sixth sections as may have been sold or disposed of by said State prior to the passage of this act shall not be changed or vitiated in consequence of or by virtue of this act.

"SEC. 2. The lands herein granted shall be selected by the state authorities of said State from any unappropriated, non-mineral public land in said State; in quantities not less than the smallest legal subdivision; and when selected in conformity with the terms of this act, the same shall be duly certified to said State by the commissioner of the general

land office, and approved by the Secretary of the Interior." 21 Stat. 287, c. 245.

On May 3, 1883, the lands in controversy were certified to the State of Nevada under this act. This certification was based on an application by the State, formally executed July 29, 1882. On May 20, 1882, the appellant applied to the proper state officers to purchase these lands. On February 2, 1884, in pursuance of this application, a contract was entered into between the State and the appellant for the sale to him of the lands in controversy; he, at the time, paying one-fifth of the purchase money, and contracting to pay the balance in subsequent annual instalments. On December 18, 1884, this bill was filed by the United States in the Circuit Court for the District of Nevada against the appellant alone. Generally speaking, the scope of the allegations in the bill is that the lands were improperly certified to the State; that in equity it had no title, and its contract with the appellant transferred nothing to him; and the prayer was for the cancellation of the contract between the appellant and the State of Nevada, and an adjudication that the appellant had no title or interest in such lands. On November 26, 1886, a decree was entered (30 Fed. Rep. 309) by which the title of appellant in the lands was divested, and he directed to surrender up to the State of Nevada, for cancellation, all contracts or agreements he had with that State for these lands. From such decree appellant appealed to this court.

*Mr. J. K. Redington,* (with whom was *Mr. John H. Hickcox, Jr.* on the brief,) for appellant.

*Mr. Assistant Attorney General Parker* for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

The first contention of appellant is, that this action could not be maintained because the State of Nevada was not made party, it holding the legal title;

Second, that the Circuit Court erred in finding that there was fraud or wrong, by which the title was passed to the State of Nevada; and,

Third, that even if there were fraud or wrong in this matter, the outcome of the proceedings was the .necessary one, and therefore the bill should not have been sustained.

With respect to the first contention : It cannot be doubted that the certification operated to transfer the legal title to the State, *Frasher* v. *O'Connor*, 115 U. S. 102, nor that the contract between the State and appellant passed to him the equitable title, the legal title being retained by the State, simply as security for the unpaid part of the purchase money. The proposition, therefore, is, that where there are outstanding two interests or titles, held by different parties, the real owner cannot proceed against either without joining the other; that only one action can be maintained to divest these parties of their separate titles; and that to that action both adverse holders must be parties. The proposition is not sound. A court of equity has jurisdiction to divest either one of the adverse holders of his title, in a separate action. Doubtless the court has power, when a separate action is instituted against one, to require that the other party be brought into the suit, if it appears necessary to prevent wrong and injury to either party, and to thus fully determine the title in one action; but such right does not oust the court of jurisdiction of the separate action against either. It has jurisdiction of separate actions against each of the adverse holders, and there is no legal compulsion, as a matter of jurisdictional necessity, to the joinder of both parties as defendants in one action. There are special reasons why this rule should be recognized in this case. It may be that the Circuit Court would not have jurisdiction of an action against the State ; that an action against a State, on behalf of the United States, can be maintainable only in this court; and that when brought in this court no other party than the State can be made defendant. We do not decide that these things are so, but suggest the difficulty which must have presented itself to the counsel for the government, and which justifies a separate suit against the holder of the equitable title. The State of Nevada might have intervened. It did not; doubtless, because it felt it had no real interest. It was no intentional party to any wrong upon the

general government. If its agency had been used by the wrong-doer to obtain title from the general government; if, conscious of no wrong on its part, it had obtained from the general government the legal title and conveyed it away to the alleged wrong-doer, it might justly say that it had no interest in the controversy, and that it would leave to the determination of the courts the question of right between the government and the alleged wrong-doer, and conform its subsequent action to that determination. That certainly is the dignified and proper course to be pursued by a State, which is charged to have been the innocent instrumentality and agent by which a title to real estate has been wrongfully obtained from the general government. The jurisdiction of the Circuit Court over this bill was properly sustained.

The second contention is, that the court erred in finding that there was fraud or wrong by which the title was taken away from the general government. The allegations of the bill are of fraud and wrong, but they also show inadvertence and mistake in the certification to the State; and it cannot be doubted that inadvertence and mistake are, equally with fraud and wrong, grounds for judicial interference to divest a title acquired thereby. This is equally true, in transactions between individuals, and in those between the government and its patentee. If, through inadvertence and mistake, a wrong description is placed in a deed by an individual, and property not intended to be conveyed is conveyed, can there be any doubt of the jurisdiction of a court of equity to interfere and restore to the party the title which he never intended to convey? So of any other inadvertence and mistake, vital in its nature, by which a title is conveyed when it ought not to have been conveyed. The facts and proceedings attending this transfer of title are fully disclosed in the bill. They point to fraud and wrong, and equally to inadvertence and mistake; and if the latter be shown, the bill is sustainable, although the former charge against the defendant may not have been fully established.

For satisfactory answer to this inquiry, a fuller statement of facts is necessary: On May 19, 1879, defendant made in the

_proper land office of the United States a desert-land entry for two hundred and forty acres, including therein the lands in controversy. 19 Stat. 377, c. 107. On July 26, 1879, he conveyed to the New Philadelphia Silver Mining Company, for the sum of five thousand dollars, eighty acres thereof, described as the east ½ of southeast ¼, section 33, township 8, range 50 east, Nye County, Nevada. The conveyance was with this warranty : " And the party of the first part agrees to and with the party of the second part that he has full right and power to sell and convey the said premises and water rights, and that they are now free from all incumbrances, sales or mortgages." Within the succeeding year the grantee erected a ten-stamp quartz mill on the premises, at the expense of about fifty-eight thousand dollars. Becoming embarrassed, this eighty acres, with improvements, passed by sheriff's and receiver's deeds to Matthiessen and Ward, the title thus passing finally by the 16th of December, 1881. The consideration of five thousand dollars, named in the original deed, was paid to Williams. On May 20, 1882, he executed papers for the relinquishment to the government of his desert-land entry, and at the same time made application to the State for the purchase of these lands as agricultural lands. At his instance, the State, on July 29, 1882, applied to the government for a certification of these lands. On August 12, 1882, by letter from the Land Department, cancellation of the desert-land entry was made on the books of the local land office, and subsequently, as stated, in May, 1883, the lands were certified to the State, and thereafter the application of Williams for purchase from the State was accepted, and the contract entered into.

Further, it appears that on June 20, 1881, the receiver of the Philadelphia company wrote to the commissioner of the land office, giving notice of the company's interest in these lands, and asking instructions as to steps necessary to protect its title. This information was followed, on February 10, 1882, by interview and communication to the department from the counsel of Matthiessen and Ward. On April 14, 1882, the commissioner answered the inquiry of the receiver, informing

him that desert-land claims were not assignable. On May 23 he advised Ward that there was no evidence in his office showing a relinquishment by Williams of the desert-land entry. In August, 1882, the land register of Nevada, replying to an inquiry of Matthiessen and Ward, said : " Mr. Williams informed me that he would try and procure the cancellation of his desert-land entry ; we have received no notice as yet of the cancellation of said entry." As weeks before Williams had filed relinquishment papers in that office, and the matter of cancellation, having been referred to Washington, was waiting response, this communication was obviously deceptive, and suggests conspiracy between the register and Williams. So obvious is this, that on September 11, 1882, the commissioner of the general land office wrote to the register for an explanation. In that letter, after referring to his information to the agent of Matthiessen and Ward, as above quoted, he adds : " Upon a cursory examination of the matter it would seem that the information, if furnished by you as aforesaid, was not in accordance with the facts in the case and misleading in result, and therefore calculated to create suspicion in the public mind as to the honest administration of your office in matters coming before you for official action. Large and valuable interests were affected by the relinquishment of Williams, and the company should have been notified when it was filed in your office, or, at all events, when it applied to you through its agent for information. Please explain the matter at once." On September 6, 1882, an application was made on behalf of Matthiessen and Ward for reinstatement of the desert-land entry, and a protest against embracing in the State's selection the eighty acres, heretofore referred to, conveyed by Williams to the Philadelphia company. This application for reinstatement of the desert-land entry was denied by the land commissioner on February 21, 1883. The application by the State for this land was at the instance of the appellant, and the application was included in a list known as " List Number 24." On January 8, 1883, Matthiessen and Ward made, in due form, an application for the five acres upon which the buildings were situated, as a mill-site. The application was

denied by the land office in Nevada on the ground that the land was embraced in the selection theretofore made by the State of Nevada. Appeal was made to the land office at Washington, and the appeal papers were received there January 18, 1883. On January 23, Curtis & Burdett, attorneys for Matthiessen and Ward, appeared in the land office at Washington and asked to be advised of any action. Immediately thereafter the officers in the Land Department noted, in pencil, within brackets, on list 24, against the land in controversy, these words, "mill-site." The effect of this annotation was to suspend action in respect to these lands until the adverse claim had been investigated and removed. Thereupon the controversy as to the right to select these lands proceeded in the department. While this controversy was pending in the department and undetermined, list 24 was presented for approval, and the annotation of the words "mill-site" having been by some person erased, and there appearing on the face of the list no controversy as to any of the lands, the certificate was made in May, as heretofore stated. The controversy proceeded in regular order until December, 1883, without any suspicion on the part of the commissioner of the land office that any certification of title had been made to any of these lands or that the controversy was not still open for adjudication. In December, 1883, on discovery of this mistake by the land commissioner, he telegraphed to the governor of Nevada to return the approved list, which application was declined, by telegram, on the advice of the attorney general of the State. On the 14th of December, 1883, the Secretary of the Interior telegraphed to the governor of Nevada, as follows:

"[Received at Carson, Dec. 14, 4:03 P.M. Dated Washington, D.C.—— 14, 1883.]

"To GOVERNOR OF NEVADA, *Carson City, Nev.:*

"Has land mentioned in dispatch of Commissioner, of 11th instant, been sold and deeded, or either? If so, to whom? Unless the list can be returned and corrected I desire to have proceedings commenced immediately to set aside the certification. "H. M. TELLER, *Secretary.*"

On the same day the appellant telegraphed as follows:—

" [Received at Carson, December 14, 4:46 P.M. Dated Washington, December 14, 1883.]

" To GOVERNOR JEWETT W. ADAMS or W. M. GARRARD:

" Have deed for my State land claim executed immediately. Give Harry Day money if he has not got it; will remit from Hot Creek. Don't delay. Answer.

Jos. T. WILLIAMS."

On the 15th of December the Secretary of the Interior telegraphed to the State register as follows:

" Tract inadvertently certified while adverse claim was pending and undecided. Much embarrassment will result to department if list be not returned as requested."

On the same day he received this answer:

" CARSON, NEV., December 15, 1883.
" To H. M. TELLER, Washington, D.C.:

" The land referred to is applied for and contracted to J. T. Williams, but no patent is yet issued.

J. W. ADAMS, Governor."

These facts make it clear that when list 24 was presented to the department, and it had received notice of an adverse claim as to these lands, the ordinary annotation was made on the list opposite to these lands, to indicate an adverse claim, and that pending the adjudication of the merits of that claim no certification would have been made; that by somebody's act, (and the record does not disclose the party,) this customary departmental entry of notice was rubbed out; and that thereafter the list, passing through the hands of the various officers of the department, with every mark of approval from the various subordinate officers, and not challenged as to this controversy, was inadvertently, unintentionally and through mistake, certified to the State of Nevada. Can there be any doubt that this land was certified through inadvertence and

mistake; and that the Land Department did not intend to certify it to the State, or approve the selection made by the State until after the determination of the pending controversy? Who made the erasure cannot be, from the testimony, determined. The defendant and his attorney in Washington city each testify that he did not make it or know of its being made; yet who would make such an erasure, save one interested in having the fact of the contest removed from notice? The suggestion made by counsel for appellant, that Matthiessen and Ward caused this to be done in order to lay the foundation for this bill, when in fact their controversy in the department had not been adjudicated as to the right of the State to make this selection, is so puerile as to intensify the suggestion against the appellant. That Williams had some information from within the department is evident from the fact that on the very day the Secretary telegraphed to the governor of Nevada he telegraphed insisting upon immediate execution of the deed from the State — a telegram received at the capital of the State forty-three minutes after that of the Secretary. We do not impugn the truthfulness of the appellant or his counsel, in the testimony given by each, "that he neither made nor knew of the making of this obliteration;" yet we cannot but be impressed with the conviction that there was some one in the department employed to look after appellant's interests in this controversy, and who, without special direction or authority, assumed to do that which he thought, and which would apparently, promote his employer's interests, to wit, the erasure from this list of any notice of contest or adverse claim. Of course, if fraud was done by one employed by appellant, he, though ignorant, must bear the consequences of that fraud. We do not doubt what the verdict of a jury would be, as to a charge of fraud, under these circumstances; but we do not care to place our decision upon this ground. We rest it upon the incontrovertible fact that through inadvertence and mistake this land was certified to the State.

This brings us to the final contention: That if there had been no erasure; that if the contest had been had, the lands must inevitably have been certified to the State of Nevada,

because they were, within the description of the act, "unappropriated, non-mineral, public land," selected by the State; that the desert-land entry by Williams, in 1879, gave to him no right which he could sell or transfer; that, therefore, the deed from him to the Philadelphia company passed nothing as against the government; that, having failed to reclaim the land within the time prescribed, his right in the land ceased, and his cancellation of his desert-land entry was a mere matter of form to clear the face of the record; that at the time of the selection and application by the State there was no legal adverse claim; that, therefore, the State had a right to select it; that having made such selection, it was the duty of the department to certify the land, and thus transmit the legal title; and that the government pays no attention to private disputes between parties who have transactions in respect to public lands before it parts with its title, and before any right is vested in either of the disputing parties.

In the main, we do not doubt these propositions of law; but there are certain equitable considerations which the department is authorized to recognize, and when recognized no court will ever disturb its action. Consider the facts in this light: Williams had made a desert-land entry; his proposition by that entry was to reclaim this land by irrigation; he conveyed by deed a portion of it to the Philadelphia company, warranting that he had perfect title and right to convey, and receiving five thousand dollars for this conveyance. On the faith of it the company expends fifty-eight thousand dollars in improvements. The time for reclamation passes, and he has failed in his implied duty to the government. With a view to secure to himself a title which he has once conveyed with warranty, he schemes to surrender his desert-land entry for cancellation, and induce the State to select and obtain title to the lands as agricultural, non-mineral lands, and then buy the title thus obtained by the State. When the department is advised of these facts, it declines to certify the title to the State. If all questions of jurisdiction and procedure were removed, would any court issue a mandamus to compel the officers of the Land Department to certify those lands to

the State? Would not the equity developed by these facts forbid the court to issue such an order? The certification after selection by the State is to be approved by the Secretary of the Interior. This is no mere formal act. It gives to him no mere arbitrary discretion, but it does give power to prevent such a monstrous injustice as was sought to be accomplished by these proceedings. It gives the power to the Secretary to deny this application of the State, and refuse to approve its selection, and hold the title in the general government until, within the limits of existing law or by special act of Congress, a party who, misinformed and misunderstanding its rights, has placed such large improvements on the property, shall be enabled to obtain title from the government.

We would not be misunderstood in respect to this matter. We do not mean to imply that any arbitrary discretion is vested in the Secretary; but we hold that the statute requiring approval by the Secretary of the Interior was intended to vest a discretion in him by which wrongs like this could be righted, and equitable considerations, so significant and impressive as this, given full force. It is obvious, it is common knowledge, that in the administration of such large and varied interests as are intrusted to the Land Department, matters not foreseen, equities not anticipated, and which are therefore not provided for by express statute, may sometimes arise, and, therefore, that the Secretary of the Interior is given that superintending and supervising power which will enable him, in the face of these unexpected contingencies, to do justice.

The decision of the Circuit Court is right, and must be

*Affirmed.*

Mr. Justice Gray was not present at the argument of this case, and took no part in its decision.