UNITED STATES v. LAVENSON et al.

(District Court, W. D. Washington, N. D. June 13, 1913.)

No. 1,875.

MINES AND MINERALS (§ 45*)—PUBLIC MINERAL LANDS—CANCELLATION OF PATENT.

On application for a patent for six mining claims adjoining each other and lying lengthwise along a river in a forest reservation, notice was sent by the register to the superintendent of the reservation, who caused an examination to be made, and as a result there was filed in the General Land Office a letter from the acting forester, inclosing reports from the state geologist and a forest ranger, and recommending that a patent be denied on the ground that the claims were held for water power and not for mineral purposes. The report of the geologist was to the effect that the claims contained very little ore and were of no commercial value for mining purposes, but were very valuable for the water power thereon. Three weeks after the filing of such papers a patent was issued to the applicant. It appeared that no hearing was had upon the protest of the forester, probably because it erroneously stated that no patent for the claims to which it related had been applied for. *Held* that, if the facts on which it was based were established, they would

constitute ground for refusing a patent, and that whether it was not considered through inadvertence, or whether, through mistake of law, it was deemed insufficient, the United States was entitled to a cancellation of the patent, that such questions of fact might be considered and determined by the Land Department.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 131; Dec. Dig. § 45.*]

In Equity. Suit by the United States against Albert. S. Lavenson and Jane Doe Lavenson, his wife, and the Whatcom County Railway & Light Company. Decree for complainant.

Charles F. Riddell, U. S. Dist. Atty., of Seattle, Wash., for the United States.

Myron A. Folsom, of Spokane, Wash., James B. Howe, of Seattle, Wash., and C. W. Howard, of Bellingham, Wash., for defendants.

CUSHMAN, District Judge. This suit is now for determination, after evidence taken. It was brought, asking cancellation of a patent heretofore issued by the United States to one E. C. Baird for certain mining claims situated in Whatcom county in the Mt. Baker mining district; the claims being known as "Rattler," "Mermaid," "Rising Current," "White Rapids," "Placid Water," and "Clear Water."

The grounds upon which the title is asked to be restored to the United States are that the alleged mining claims never did contain any valuable mineral deposits, nor any veins or lodes of quartz or other rock in place bearing any valuable mineral deposit whatsoever; that patent was procured by fraudulent representations of the discovery of valuable mineral deposits upon the claims, and each of them, and that the lands were of mineral character, and were located and claimed by the said Baird, and desired on account of their valuable mineral deposits, whereas, in truth and in fact, no such discovery of veins or lodes had ever been made, nor were said lands located as claims or desired on account of any mineral deposits therein.

The patent is further sought to be canceled on the ground that it was issued through inadvertence and mistake, while a protest was pending against its issuance by the Forest Service having jurisdiction in the reserve in which these claims were located. The following facts are established:

That the claims are situated adjoining each other for a distance of about a mile along the North fork of the Nooksack river, the length of the claims following the course of the river. That the claims involved in this case were at all times within a forest reserve of the United States. That the "Clear Water," "Rising Current," "White Rapids" and "Placid Water" were located in April, 1902; the other two claims, the "Rattler" and "Mermaid," being located in 1903. In September, 1905, J. J. Donavon, one of the locators, conveyed the six claims to the Bellingham Bay Improvement Company, which company conveyed the claims to one E. W. Purdy. The said E. W. Purdy conveyed the claims to E. C. Baird April 1, 1907. The claims were surveyed for patent in 1904; but no application for patent was filed

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

at that time. On December 12, 1907, E. C. Baird made application for patent, and on April 9, 1908, patent was issued to him.

On the hearing it was stipulated between the parties that Alfred S. Lavenson acquired the title to these mining claims from Mr. Baird, and transferred the same to the Whatcom County Railway & Light Company, one of the defendants, and that in the acquiring and transfer of said title the said Lavenson was acting solely as the agent and as a trustee for the Whatcom County Railway & Light Company and that he had no personal interest therein.

Mr. Baird did not acquire the claims for his own use, but took them at the request and, he presumed, for the benefit of an old acquaintance, to be handled and transferred as the latter directed. There is no direct evidence that this acquaintance acted for the Whatcom County Railway & Light Company.

The defendants admit that they are chargeable with notice of whatever Baird, the patentee, knew; that, if he did not acquire the claims in good faith, they are to be charged with knowledge of that fact.

Another group of patented claims, on the river immediately below those in question, was owned by the Bellingham Bay Improvement Company until 1905. That company commenced the construction of a power plant upon that property, and in the year 1905 the present defendant, Whatcom County Railway & Light Company, purchased that property with the uncompleted plant and completed the same.

At the time of filing the application for patent, notice was sent by the register to the superintendent of the Washington Forest Reserve. He made an examination of the property, and on March 17, 1908, there was filed in the General Land Office a letter from the acting forester, inclosing reports from the Washington state geologist and a deputy forest ranger. The letter of the acting forester recommended:

"That the locations be declared invalid, since it is clearly shown that the claims are held for water power purposes, and not for bona fide mining operations."

The inclosed report of the deputy forest ranger, approved by the forest supervisor, recommended that the claims "be listed for examination in accordance with the forester's letter, L—C, of March 23, 1907."

The report of the geologist, inclosed, was to the effect that:

"Upon the claims there are no distinct ledges or fissure veins, or instances of well-defined mineralized zones. Iron pyrite occurs in minute quantities disseminated through the country rock, as well as in occasional very small gash veins. In the slates there are at some points small stringers of quartz, carrying iron pyrite. The tunnels which have been driven on the claims have been located at convenient points wherever the rock was exposed in cliffs, and not because of the known occurrence of ore at these places. In other words, the tunnels do not follow ore bodies, nor are they cross-cuts to known bodies, but have been located and driven at points where the work could be done with the most convenience. The center line of the claims, marked 'lode line' does not mark the location of any ledge, or vein, or ore body which differs in any way from the general country rock of the claims entire."

That samples, taken from the tunnels on the claims, assayed, in gold, 40 cents per ton on the "Rattler," 60 cents per ton on the "Mer-

maid," 80 cents per ton on the "Rising Current," 40 cents per ton on the "White Rapids," 40 cents per ton on the "Placid Water," and nothing on the "Clear Water."

His report concludes:

"The examination of the Baird claims brings out the fact that they contain no well-defined veins, ledges, mineralized zones, or distinct ore bodies of any sort. Some portions of the country rock contain very small stringers of quartz carrying a little iron pyrite, and occasionally iron pyrite occurs disseminated through the different formations. The assay returns in every case are very low, and indicate that mining operation would be wholly unprofitable. The investigation shows that these claims are of no commercial importance whatever from a mining standpoint, and hence the patents are desired for other reasons. The claims are of no value for agriculture, of but little value for their timber, but are of great value because of their water power. Hence the conclusion is inevitable that the claims are desired, not for mining purposes at all, but exclusively for the valuable water power present in the Nooksack river at this point."

In the vicinity of these claims there was a mine, known as the "Great Excelsior," which, there is evidence tending to show, had produced upwards of $50,000 in gold.

Defendants contend that the vein on which the "Great Excelsior" mine is located passes through the claims in controversy. There is evidence tending to show that the predecessors in interest to Baird spent some $5,000 on the claims here in question in tunnel work. No money has been spent for the purpose of developing any water power on the claims in question. No work has been done upon the claims of any kind since 1907.

It is conceded that there is a valuable water power on these claims, near the city of Bellingham, Wash., and that the defendant Whatcom County Railway & Light Company is primarily engaged in power projects, rather than mining.

Claimant relies upon the following authorities: Revised Statutes, § 2325, 5 Fed. Stat. Ann. p. 31 (U. S. Comp. St. 1901, p. 1429); Revised Statutes, § 2320, 5 Fed. Stat. Ann. p. 8 (U. S. Comp. St. 1901, p. 1424); King v. Amy, etc., Co., 152 U. S. 222, 14 Sup. Ct. 510, 38 L. Ed. 419; Davis v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed. 238; United States v. Central Pacific (C. C.) 93 Fed. 871; Revised Statutes, § 2319, 5 Fed. Stat. Ann. p. 4 (U. S. Comp. St. 1901, p. 1424); United States v. Iron Silver Min. Co. (C. C.) 24 Fed. 568; Id., 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571; Lange v. Robinson, 148 Fed. 799, 79 C. C. A. 1; Chrisman v. Miller, 197 U. S. 313, 25 Sup. Ct. 468, 49 L. Ed. 770; Steele v. Tanana Mines Company, 148 Fed. 678, 78 C. C. A. 412; U. S. v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384; Germania Iron Co. v. U. S., 165 U. S. 383, 17 Sup. Ct. 337, 41 L. Ed. 756; Williams v. United States, 138 U. S. 515, 11 Sup. Ct. 457, 34 L. Ed. 1026; Act June 4, 1897, c. 2, 30 Stat. 36, 7 Fed. St. Ann. 315 (U. S. Comp. St. 1901, p. 1538); Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415; Cosmos Exploitation Co. v. Gray Eagle Oil Co., 190 U. S. 301, 23 Sup. Ct. 692, 47 L. Ed. 1064; Iron Silver Min. Co. v. Mike & S. Co., 143 U. S. 394, 12 Sup. Ct. 543, 36 L. Ed. 201; Erhardt v. Boaro, 113 U. S. 536, 5 Sup. Ct. 564, 28 L. Ed. 1113; 33 Land Dec. Dept. Int. p. 609;

Regulations of the General Land Office, approved October 23, 1903; Alford v. Barnum, 45 Cal. 482.

Defendants rely upon the following authorities: Shoshone v. Rutter, 87 Fed. 801, 31 C. C. A. 223; Eureka Co. v. Richmond, 4 Sawy. 302, Fed. Cas. No. 4,548; Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; Barden v. N. P. Ry. Co., 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992; Book v. Justice Mining Co. (C. C.) 58 Fed. 106; Cascaden v. Bortolis, 162 Fed. 271, 89 C. C. A. 247, 15 Ann. Cas. 625; Henderson v. Fulton, 35 Land Dec. Dept. Int. 652, 658; Creede Co. v. Uinta Tunnel Co., 196 U. S. 347, 25 Sup. Ct. 266, 49 L. Ed. 501; Costigan Min. Law, p. 585; Tam v. Story, 21 Land Dec. Dept. Int. 440, 442; Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423; 10 Fed. Stats. Ann. 404; U. S. v. N. P. Railway, 95 Fed. 864, 882, 37 C. C. A. 290; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; U. S. v. Marshall, 129 U. S. 579, 9 Sup. Ct. 343, 32 L. Ed. 734; Shaw v. Kellogg, 170 U. S. 312, 18 Sup. Ct. 632, 42 L. Ed. 1050; Thallmann v. Thomas, 111 Fed. 277, 49 C. C. A. 317.

The question of the issuance of the patent through inadvertence and mistake will first be considered. In 1903, while the entire administration of the forest reserves was intrusted to the Interior Department, the following regulation was made by that department:

"All mineral entries on lands in the forest reservations presented for patent shall be investigated and reported upon by the officers in charge of the respective reservations before being passed to patent, and final action on all such cases shall be suspended until such investigations are made and reports forwarded to this office." Regulations of General Land Office, approved October 23, 1903.

Later the administration of forest reserves, with certain exceptions, pertaining to the acquiring of titles, was intrusted to the Department of Agriculture by the act of February 1, 1905, providing:

"That the Secretary of the Department of Agriculture shall, from and after the passage of this act, execute or cause to be executed all laws affecting public lands heretofore or hereafter reserved under the provisions of section twenty-four of the act entitled 'An act to repeal the timber-culture laws, and for other purposes,' approved March third, eighteen hundred and ninety-one, and acts supplemental to and amendatory thereof, after such lands have been so reserved, excepting such laws as affect the surveying, prospecting, locating, appropriating, entering, relinquishing, reconveying, certifying, or patenting of any of such lands." Act Feb. 1, 1905, c. 288, 33 Stat. 628, 10 Fed. Stat. Ann. 404 (U. S. Comp. St. Supp. 1911, p. 635).

Subsequently the Department of the Interior promulgated the following rules:

"1. A government officer in charge of any national forest may initiate a contest or other proceeding before the Land Department, respecting the unlawful occupation or use of land within a national forest by reason of a claim made thereto under any of the public land laws.

"2. As a basis for such proceeding such officer shall file in the local land office for the district in which the lands involved are located a complaint signed by him in his official capacity, but not under oath or corroborated, setting forth facts respecting the alleged unlawful occupation or use of the public lands.

"3. Upon the filing of a sufficient complaint in any case in which final certificate has not issued, the register and receiver will issue a notice with a copy

of such complaint attached thereto to the defendant, notifying him that unless he within thirty days from the receipt of such notice files in their office a denial or answer to such charges in writing and under oath, the truth of such charges will be taken as confessed by him, and any entry, filing or claim asserted to such land, under the land laws by such party may be declared forfeited or canceled without further notice to him.

"4. When a complaint has been filed respecting any claim upon which final certificate has issued, or where denial under oath is filed in answer to a notice issued under the preceding paragraph, the same will be at once forwarded to the Commissioner of the General Land Office and the further progress of the matter will be in accordance with the circular of February 14, 1906 (34 Land Dec. Dept. Int. 439), defining the manner of proceeding upon special agents' reports."

It is probable, and the court finds, that no hearing was had in the land office upon the protest of the forester, and that no consideration was given to it by the Department of the Interior, for the reason that the protest itself incorrectly stated that no patent had been applied for, and that, because of this mistake, the protest was overlooked.

The powers and duties of the Secretary of the Interior have been considered by the Supreme Court of the United States, and by that court it has been said:

"In the main, we do not doubt those propositions of law; but there are certain equitable considerations which the department is authorized to recognize, and when recognized no court will ever disturb its action. * * * If all questions of jurisdiction and procedure were removed, would any court issue a mandamus to compel the officers of the Land Department to certify those lands to the state? Would not the equity developed by these facts forbid the court to issue such an order? The certification after selection by the state is to be approved by the Secretary of the Interior. This is no mere formal act. It gives to him no mere arbitrary discretion, but it does give power to prevent such a monstrous injustice as was sought to be accomplished by these proceedings. It gives the power to the Secretary to deny this application of the state, and refuse to approve its selection, and hold the title in the general government until, within the limits of existing law or by special act of Congress, a party who, misinformed and misunderstanding its rights, has placed such large improvements on the property, shall be enabled to obtain title from the government. We would not be misunderstood in respect to this matter. We do not mean to imply that any arbitrary discretion is vested in the Secretary; but we hold that the statute requiring approval by the Secretary of the Interior was intended to vest a discretion in him by which wrongs like this could be righted, and equitable considerations, so significant and impressive as this, given full force. It is obvious, it is common knowledge, that in the administration of such large and varied interests as are intrusted to the Land Department, matters not foreseen, equities not anticipated, and which are therefore not provided for by express statute, may sometimes arise, and, therefore, that the Secretary of the Interior is given that superintending and supervising power which will enable him, in the face of these unexpected contingencies to do justice." Williams v. U. S., 138 U. S. 514, at 523 and 524, 11 Sup. Ct. 457, at 460 (34 L. Ed. 1026).

In Knight v. United States Land Association, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974—the opinion being written by Justice Lamar—it is said:

"This contention is based upon the proposition that the Secretary of the Interior had no authority to set aside the order of the Commissioner approving and confirming the Stratton survey, especially in view of the fact that no appeal was taken from such order and the authorities of the city acquiesced in that survey. This proposition is unsound. If followed as a rule of law, the Secretary of the Interior is shorn of that supervisory power over the public

lands which is vested in him by section 441 of the Revised Statutes [U. S. Comp. St. 1901, p. 252]. That section provides as follows: 'The Secretary of the Interior is charged with the supervision of public business relating to the following subjects: * * * Second. The public lands, including mines.' * * * The phrase, 'under the direction of the Secretary of the Interior,' as used in these sections of the statutes, is not meaningless, but was intended as an expression in general terms of the power of the Secretary to supervise and control the extensive operations of the Land Department, of which he is the head. It means that, in the important matters relating to the sale and disposition of the public domain, the surveying of private land claims, and the issuing of patents thereon, and the administration of the trusts devolving upon the government, by reason of the laws of Congress or under treaty stipulations, respecting the public domain, the Secretary of the Interior is the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States. * * * When proceedings affecting titles to lands are before the department the power of supervising may be exercised by the Secretary, whether these proceedings are called to his attention by formal notice or by appeal. It is sufficient that they are brought to his notice. The rules prescribed are designed to facilitate the department in the dispatch of business, not to defeat the supervision of the Secretary. For example, if, when a patent is about to issue, the Secretary should discover a fatal defect in the proceedings, or that by reason of some newly ascertained fact the patent, if issued, would have to be annulled, and that it would be his duty to ask the Attorney General to institute proceedings for its annulment, it would hardly be seriously contended that the Secretary might not interfere and prevent the execution of the patent. He could not be obliged to sit quietly and allow a proceeding to be consummated, which it would be immediately his duty to ask the Attorney General to take measures to annul. It would not be sufficient answer against the exercise of his power that no appeal had been taken to him, and therefore he was without authority in the matter. * * * 142 U. S. at pages 177 and 178, 12 Sup. Ct. at page 262 [35 L. Ed. 974]. It makes no difference whether the appeal is in regular form according to the established rules of the department, or whether the Secretary on his own motion, knowing that injustice is about to be done by some action of the Commissioner, takes up the case and disposes of it in accordance with law and justice. The Secretary is the guardian of the people of the United States over the public lands. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted, or is disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of public lands." 142 U. S. at page 181, 12 Sup. Ct. at page 264 [35 L. Ed. 974].

The powers of the Secretary and the discretion vested in him are not to be exercised by favor or at will. It is a legal discretion. The forester, in transmitting the charges, made them his own. It will not be presumed that the protest was ignored because of any informality in its presentation to the Department of the Interior. In view of the duties and powers of the Secretary of that department to enforce equity, or to refuse title for want of equity, and the divided responsibility between the Interior Department and the Department of Agriculture in the administration of forest reserves, nothing short of an express declaration by the Department of the Interior to that effect would warrant such a finding.

The defendants prefer to take the position that the protest was deemed insufficient on its face to warrant inquiry as to the facts charged therein, arguing that:

"The so-called protest which was filed was plainly insufficient, and did not tender any issue upon which a hearing should be ordered. The department is-

sued the patent after three weeks' consideration of the protest, conclusively determining that the land was mineral in character, and that the purpose for which the parties desired the claims was immaterial."

If the presumption attached upon the issuance of patent that this protest of the forester was considered by the Commissioner of the General Land Office and found insufficient to warrant a hearing, or consideration of the truth of the matters charged, it then becomes necessary to determine whether the allegations contained in the complaint and protest, if true, would defeat claimant's right to recovery, and if it be determined that they would defeat such right, and indulging in the presumption contended for, that the Department of the Interior reached a contrary conclusion, that would constitute a mistake of law, which would be corrected by the court. 32 Cyc. 1028, b; Quinby v. Conlan, 104 U. S. 420, 26 L. Ed. 800; Lee v. Johnson, 116 U. S. 48, 6 Sup. Ct. 249, 29 L. Ed. 570.

This renders the result the same, whether it is found that a sufficient protest was inadvertently ignored by the Department of the Interior, or erroneously found insufficient as a matter of law. The substance of the protest was that, while the claims sought contained small quantities of gold, yet they were valueless for mining purposes, in that they could not be worked at a profit; that they were not taken for mining purposes, but solely for power purposes.

Defendants have argued:

"To sustain the validity of the lode mining claim, where there are no adverse claims, it is not necessary to show the existence of pay ore."

In this defendants assume that there was no adverse claim made. This assumption is not warranted—the forester's protest amounted to such a claim. Presumption arises from the creation of a forest reserve that the land in it is valuable for at least some of the purposes for which forest reserves are created. While the land remained a part of the forest reserve, the discovery of pay ore alone would warrant its being carved out of the reserve and disposed of under the mineral land laws.

Discovery is necessary to initiate a mining right. To constitute discovery, it is necessary that mineral-bearing rock in place be found, under such circumstances and of such a character that a reasonably prudent man, not necessarily a skilled miner, would be justified in expending time and money developing it, with the reasonable expectation of finding ore in paying quantities. This implies, not only that the conditions warrant a reasonably prudent man in so proceeding, with such reasonable expectation, but that the applicant for patent has that expectation. The claim may be valuable for other purposes and the applicant may, in part, be actuated by knowledge of its nonmineral values.

"It may be, as contended, that Stevens was moved in his advice to Sawyer as much by the existence of the valuable growth of timber on the land as by the existence of gold in the ground, and that the timber could be advantageously used by the Iron Silver Mining Company. If such were the fact, it would not affect the applicant's claim to a patent. Probably in a majority of cases, where a placer claim is located, other matters than the existence of valuable deposits of mineral enter into the estimate of its worth. Its accessibility to places where supplies and medical attendance can be obtained

for the men engaged in working upon it, and timber secured to support the drifting or tunneling which may be necessary, the facility with which water can be brought to wash the mineral from the earth, sand, or gravel with which it may be mingled, and the uses to which the land may be subjected when the claim is exhausted, may be proper subjects of consideration. A prudent miner, acting wisely in taking up a claim, whether for a placer mine or for a lode or vein, would not overlook such circumstances, and they may in fact control his action in making the location. If the land contains gold or other valuable deposits in loose earth, sand, or gravel, *which can be secured with profit*, that fact will satisfy the demand of the government as to the character of the land as placer ground, whatever the incidental advantages it may offer to the applicant for patent." Justice Field, in U. S. v. Iron Silver Min. Co., 128 U. S. 673, at 684, 9 Sup. Ct. 195, at 199 (32 L. Ed. 571).

The statute itself reads:

"A patent for any land *claimed and located for valuable deposits* may be obtained in the following manner: * * *" Section 2325, R. S., 5 Fed. Stats. Ann. p. 31 (U. S. Comp. St. 1901, p. 1429).

The land must not only be located for valuable deposits, but claimed for such deposits, when patent is asked. If the sole purpose of location, or making claim to the land, when patent is sought, is to secure valuable water power or timber, a claimant is not entitled to it under the mineral land law. The decision of the Supreme Court by Justice Field, in the last-mentioned cause, does not justify any other assumption, for therein it is said:

"If the land contains gold * * * *which can be secured with profit*, that fact will satisfy the demand of the government as to the character of the land as placer ground, whatever the *incidental* advantages it may offer to the applicant for a patent."

If the claimant represents that he claims the land for its valuable deposits, when in fact he does not, and if, but for such representation, he would not receive a patent, but, relying on it, he is granted one, this is fraud. Against this, defendants contend:

"The question here involved is different from one which arises between a mineral claimant and a townsite applicant, or one which arises between a placer claimant and a lode applicant, or one which arises between an agricultural or timber claimant and a mineral applicant. In such cases, different statutes are involved, and the relative value is a factor. Barden v. N. P. Ry. Co., 154 U. S. 288, 14 Sup. Ct. 1030, 38 L. Ed. 992. But in the case here in controversy the land is conceded to be valueless either for agriculture or timber, and it is not claimed by others for a townsite or a placer mine. The sole question is whether the land is sufficiently mineralized to sustain valid locations, as between the government and a locator."

The following sections of the statute of 1891 show that relative values are involved as much as in the instances recited by defendants, and further show that discovery alone is not sufficient, and that nothing short of a probably commercially valuable mine will suffice in a forest reserve:

"All public lands heretofore designated and reserved by the President of the United States under the provisions of the act approved March third, eighteen hundred and ninety-one, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as public forest reserves under said act, shall be as far as practicable controlled and administered in accordance with the following provisions:

"No public forest reservation shall be established, except to improve and protect the forest within the reservation, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States: but it is not the purpose or intent of these provisions, or of the act providing for such reservations, *to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forests purposes.*" Act June 4, 1897, c. 2, 30 Stat. 34, 7 Fed. Stats. Ann. 312 (U. S. Comp. St. 1901, p. 1539).

The duties of the Secretary, provided in the following section, by the act of 1905, devolved upon the Secretary of the Interior:

"Upon the recommendation of the Secretary of the Interior, with the approval of the President, after sixty days' notice thereof, published in two papers of general circulation in the state or territory wherein any forest reservation is situated, and near the said reservation, any public lands embraced within the limits of any forest reservation which, after due examination by personal inspection of a competent person appointed for that purpose by the Secretary of the Interior, shall be found better adapted for mining or for agricultural purposes than for forest usage, may be restored to the public domain. And any mineral lands in any forest reservation which have been or which may be shown to be such, and subject to entry under the existing mining laws of the United States and the rules and regulations applying thereto, shall continue to be subject to such location and entry, notwithstanding any provisions herein contained." Act June 4, 1897, c. 2, 30 Stat. 36, 7 Fed. Stat. Ann. 315 (U. S. Comp. St. 1901, p. 1542).

It has been said by the Supreme Court of the United States:

"It is in effect a suit by the government to restore to a tribunal to which it has committed exclusive jurisdiction over certain matters that jurisdiction which through inadvertence and mistake it has been deprived of. 'Relief, when deeds or other instruments are executed by mistake or inadvertence of agents, as well as upon false suggestions, is a common head of equity jurisprudence.' Hughes v. United States, 4 Wall. 232, 236 [18 L. Ed. 303]. Congress has intrusted to the Land Department the disposal of the public lands, and has invested the officers of that department with exclusive jurisdiction over many things in connection with such disposition. Their determination in respect to questions of fact in all matters of contest is exclusive and final. The issue of a patent is in effect the final determination of that department in favor of the patentee and against the contestants of all disputed questions of fact—a determination which it is not the function of courts to review except upon conditions of fraud, etc., which permit courts of equity to investigate and pass judgment upon all determinations of all tribunals. By inadvertence and mistake a patent in this case has been issued, and the effect of such issue is to transfer the legal title and remove from the jurisdiction of the Land Department the inquiry into and consideration of such disputed questions of fact. The contention of the appellants is substantially that the courts must consider and determine those disputed questions of fact, and exercise a jurisdiction not committed to them, before they restore to the Land Department the jurisdiction of which it was been wrongfully deprived. But why should the courts be called upon to consider and determine questions of fact, and after a determination adversely to the patentee relegate the matter for re-examination and determination in the Land Department? Is not the duty of the court fully performed when it ascertains that through such inadvertence and mistake the department which has jurisdiction over such matters has been deprived thereof? It restores to such department its lost jurisdiction and leaves to the tribunal designated by Congress the full power to discharge the duties conferred upon it. It is true that it does not affirmatively appear in this case that the patentee was not entitled equitably to the land, or that the contestants had any superior right thereto; but his rights and their rights depend upon questions of fact, such as priority of application, etc., the determination of which by

act of Congress has been committed to the Land Department. It and not a court of equity is the tribunal intrusted by the law with jurisdiction over such matters, and the latter may not inquire what ought to have been the determination of the former, but whether it has been wrongfully deprived of the power to make such determination." Germania Iron Co. v. U. S., 165 U. S. 379, at 383 and 384, 17 Sup. Ct. 337, at 339 (41 L. Ed. 754).

The questions of fact involved in this proceeding, presented by the protest of the forester, concerning the character of the land and the good faith of the claimant, are matters to be determined by the Department of the Interior; no hearing having been had by that department upon the charges made in the protest.

Decree will be entered canceling the patents