### WOERHEIDE et al. v. BARBER ASPHALT PAVING CO.

(Circuit Court of Appeals, Eighth Circuit. April 2, 1918. Rehearing Denied July 8, 1918.)

No. 4802.

1. CONTRACTS ⚸9(1)—VALIDITY—UNCERTAINTY.

A contract giving defendant, a manufacturer of composition roofing, the exclusive right to use and sell patented cleats for such roofing during the life of the patent, and obligating defendant to purchase certain cleats, etc., *held* void for uncertainty.

2. SALES ⚸98—ENFORCEMENT—BREACH.

Where a contract provided that defendant should purchase 25,000 sets of cleats monthly, the fact that defendant in one month purchased less than that number is an inconsequential breach, and will not destroy its rights, where the amount was made up the following month.

3. CONTRACTS ⚸105—PERFORMANCE—EFFECT.

Complete performance of only one of five or six important executory contract obligations cannot prevent avoidance of the contract, where others equally important remain executory and are uncertain.

4. CANCELLATION OF INSTRUMENTS ⚸57—CONTRACTS—ACCOUNTING.

Where a contract which was legally uncertain was substantially performed by both parties up to the date of the attempted avoidance, complainant is not in a suit to cancel the contract entitled to an accounting.

Munger, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by William H. Woerheide and others against the Barber Asphalt Paving Company. From a decree dismissing the bill, complainants appeal. Reversed, with instructions.

Phillip W. Haberman, of New York City, and Henry S. Caulfield, of St. Louis, Mo. (Gustave L. Stern and George F. Haid, both of St. Louis, Mo., on the brief), for appellants.

Henry N. Paul, Jr, of Philadelphia, Pa., and Allen C. Orrick, of St. Louis, Mo. (Nagel & Kirby, of St. Louis, Mo., on the brief), for appellee.

Before CARLAND and STONE, Circuit Judges, and MUNGER, District Judge.

---

⚸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

STONE, Circuit Judge.   Action by William H. Woerheide and the Kant-Leak Kleet Company against the Barber Asphalt Paving Company to have certain contracts declared void.   Additional relief, such as might follow annulment of the contracts, was asked, in the nature of an accounting and a prevention of further institution or prosecution of suits affecting patents covered by the contracts.   From a dismissal of the bill plaintiff appeals.

As a bar to any consideration of the case upon its merits appellee interposed the charge that appellants come with "unclean hands." We have carefully examined the entire evidence bearing thereon, and find it does not sustain the construction placed thereon by appellee. The original contract, dated March 15, 1910, was followed by two contracts, dated February 25, 1911, and June 8, 1914, each of which was expressed as being in addition to and as modifying the contract or contracts preceding it.   They covered the exploitation and sale of two patented metal cleats, used to secure manufactured roofing in place, known as the Kant-Leak Kleet and the Kontinuous Kant-Leak Kleet, or Klincher-Kleet.   Such portions as are necessary to an understanding of the points decided are placed in the margin.[1]

[1] Contract of March 15, 1910.

*       *       *       *       *       *       *       *       *       *

Whereas, the parties of the first part are the exclusive owners of a certain new and useful cleat for securing prepared roofing;  * * *

And, whereas, the Barber Asphalt Paving Company is desirous of securing the exclusive right to use, employ and sell cleats embodying the said invention, or improvements or modifications thereof, in connection with the sale of its roofing;  * * *

Now, therefore, this agreement witnesseth:

1. The parties of the first part, in consideration of the sum of one dollar paid to them by the party of the second part and the other considerations contained herein, hereby grant to the party of the second part, its successors and assigns, the exclusive right and license to use, employ and sell the said "Huttig's Kant-Leak Kleet," and the invention covered by the above recited application, or the patent granted or to be granted thereupon, and such improvements, modifications or alterations thereof, as may be either owned by, or invented by or patented to the parties of the first part to the full end of the term for which said patents are or may be at any time granted.  * * *

4. The parties of the first part further agree to manufacture said cleats * * * fully up to the standard of those heretofore made, * * * and in such quantities as may be necessary to supply the demand of the party of the second part and its customers therefor; and in order to further provide for the demand of the party of the second part and its customers for these cleats, the parties of the first part shall at all times, keep on hand, at the plant of the party of the first part * * * a sufficient supply of said cleats for the requirements of the party of the second part.

5. The parties of the first part hereto agree that they will at their own expense save harmless the party of the second part from any suits or actions which may be brought against the said party of the second part, or any of its customers, charging the sale or use of said cleats to constitute an infringement of any existing patents.  * * *

6. The parties of the first part further agree to maintain the exclusiveness of the rights herein granted to the party of the second part, by promptly instituting the necessary proceedings to enjoin any infringement upon the patent or patents covering the said cleats, or upon the trade-marks used in connection with their sale, and to diligently prosecute said actions at their own expense, it being the end and purport of this agreement that the exclusive

The validity of these contracts is attacked on the ground of lack of mutuality in that certain vital executory obligations of appellee are so uncertainly defined in the contract that they are incapable of judicial ascertainment and enforcement. The three contracts were intended to be treated as one agreement, are susceptible of being so regarded, and will be so considered. There was no attack upon the contracts until some months after the last of the above modifying contracts. Therefore the contention that the contract was uncertain and indefinite need be determined only in connection with the agreement in its final form as affected by the two additions and modifications. However, the sum total of appellee's obligations as outlined by all of the contracts is best reached by first considering those obligations in each of the three contracts seriatim, and afterwards summarizing such as remained active in the final agreement.

[1] A better conception of the value to be placed upon the contract provisions may be gained if the situation of the parties at the time

rights herein granted to the party of the second part, shall be fully maintained by the parties of the first part at their own expense.

7. In consideration of the foregoing covenants by the parties of the first part, the party of the second part hereby agrees to purchase from the parties of the first part, the cleats manufactured and sold by them and to which this agreement refers, in such quantities as may be necessary to fill its orders for the same, the price to be twenty-five cents ($.25) per set of one hundred and eight (108) cleats (with sufficient galvanized nails, packed in cartons, together with direction for laying), f. o. b. Maurer, New Jersey; terms, 30 days net, or 2% discount for cash in ten (10) days from date of shipment.

8. The party of the second part further agrees to feature and offer to the trade their high grade roofings, packed with "Kant-Leak Kleets," but reserve the right to pack and sell said goods with or without the cleats, or otherwise as the party of the second part may desire.

9. The party of the second part agrees in connection with its current advertising of roofing-material to include favorable references to said cleat and to advocate its use and sale in such periodicals as it may deem advisable; but as this advertising is without expense to the parties of the first part the extent of it is left to the sound judgment of the party of the second part. By high grade roofings in this clause is meant the standard Genasco roofings, as now manufactured by the party of the second part, or goods of the same quality, packed in private brands. It does not include "Phœnix" roofing, or similar cheap roofing. It being the intent of this clause that in return for the exclusive sales rights, etc., acquired by the party of the second part, they will advertise and advocate the sale of their high grade roofing packed with "Kant-Leak Kleets," as long as there is a substantial demand therefor.

10. * * * The party of the first part shall not be required to supply more than five hundred thousand (500,000) sets of said cleats during any one year of the life of this agreement, unless the party of the second part shall give notice in writing at least ninety (90) days in advance, stating their requirements in excess of the foregoing stipulated amount for any one year or portion of such year. * * *

### Contract of February 25, 1911.

*    *    *    *    *    *    *    *    *    *

We agree to reduce our present agreement price of "Kant-Leak Kleets" to you to twenty-two and a half cents per set, f. o. b. Maurer, N. J. Terms net cash on tenth of month following shipments. * * *

This reduction is made with the understanding and agreement on your part, that you will reduce your present prices on all of your roofing supplied and packed with "Kant-Leak Kleets" on and after May 1st, 1911, five cents per

is understood. Appellant Woerheide had shortly before invented a method of fastening in place prepared roofing. This device was to replace the broadheaded nails and cement then generally in use. It was the custom of manufacturers of prepared roofing to pack and ship therewith the necessary fastenings. It was therefore highly advantageous, if not necessary, that a sales arrangement for these cleats be made with some manufacturer of such roofing. Appellee was such manufacturer on a large scale, and packed with its roofing nails and cement as fasteners. The cleat had been on the market a year and had, considering its novelty, met with a degree of success. However, it could, in that short time, hardly be said to have established a place in the trade. It was still rather a novelty, apparently with an attractive future. If it were successful, its exclusive control would be of value to a manufacturer of roofing. In this setting the original contract was made.

The provisions therein affecting the appellee refer to the exploi-

square, and that you will maintain such prices to within five cents per square of the price charged by you for the same grades of roofings, supplied and packed with large headed nails and cement.

In further consideration of this reduction of price, you agree to offer and sell all of your high grade smooth and sanded surfaced roofings (Genasco and Private brands) supplied exclusively with our "Kant-Leak Kleets" for laying same, except in such instances where your customers may demand the old-style supplies, viz., large-headed nails, or tin caps nails and cement. * * *

We further agree to co-operate with you in conducting an advertising campaign during the present year, in behalf of your high grade roofings supplied with our "Kant-Leak Kleets." Said advertising matter to consist of mailing literature, samples, and demonstrating boards, featuring the "Kant-Leak Kleets," to be prepared and furnished by you to your customers gratis. The expense of such advertising to be borne jointly and equally by you and ourselves. The extent of this advertising to be determined by your own good judgment, but it being understood and agreed that our total expense and liability during the year, for such advertising, shall not exceed a total sum of [on] equivalent to two and a half cents per set, for every set of "Kleets" purchased from us by you during said year. * * *

### Contract of June 8, 1914.

\* \* \* \* \* \* \* \* \* \*

Whereas, the said contract likewise covered improvements, modifications, and alterations to said Kleet, and William H. Woerheide has notified the Kleet Company that such an improvement on the Kant-Leak Kleet has been developed and a United States patent on said improvement has been allowed, application for same having been filed on June 13, 1913, and serial number of same being 773,491 and has placed the same at the disposal of the Kleet Company, in order that the Kleet Company in turn may grant the Barber Company its rights in same, as required by the said agreement of March 15, 1910, and the amending addendum to same of February 25, 1911; and

Whereas, the Barber Company and the Kleet Company desire that the said contract of March 15, 1910, as modified by the Kleet Company's addendum agreement with the Barber Company of February 25, 1911, shall be further modified:

Now, therefore, in consideration of the sum of one dollar ($1.00) duly paid by each of the parties hereto unto the other, receipt of which is hereby acknowledged, and other good and valuable considerations hereby acknowledged received, It is mutually agreed as follows, to wit:

It is agreed that the Kleet Company hereby grants to the Barber Company,

tation and to the purchase of the cleats—to the creation of a demand for them and the supply of that demand exclusively through the appellee. What obligations in these directions were placed by the original contract upon appellee? The contract of 1910 provided that the appellee agreed to purchase the cleats "in such quantities as may be necessary to fill its orders for the same"; to "feature and offer to the trade their high-grade roofings, packed with 'Kant-Leak Kleets,' but reserve the right to pack and sell said goods with or without the cleats, or otherwise as the party of the second part [appellee] may desire"; and "in connection with its current advertising of roofing material to include favorable references to said cleat and to advocate its use and sale in such periodicals as it may deem advisable; but as this advertising is without expense to the parties of the first part the extent of it is left to the sound judgment of the party of the second part." In the same clause it defined "high-grade roofings" as being its "standard

its successors and assigns, in addition to the rights which it already has in the Huttig Kant-Leak Kleet, the exclusive right and license to use, employ and sell the improved and modified kleet as covered by the above-mentioned application filed June 13, 1913, or as covered by the patent granted or to be granted thereupon, * * * to the full end of the term for which such patents are or may be at any time granted.

The original Kant-Leak Kleet covered by the agreement of March 15, 1910, is hereinafter referred to as the Kant-Leak Kleet, while the improved and modified Kant-Leak Kleet referred to herein as covered by application filed June 13, 1913, is hereinafter referred to as Kontinuous Kant-Leak Kleet. * * *

The Barber Company agrees to accept delivery of and purchase not less than one hundred fifty thousand (150,000) sets of kleets to be delivered at the rate of twenty-five thousand (25,000) sets per month, during the balance of the calendar year 1914, and to pay twenty cents (20¢) per set for Kant-Leak Kleets so delivered, and seventeen cents (17¢) per set for Kontinuous Kant-Leak Kleets so delivered; delivery to be made at the Barber Company's plants at Maurer, New Jersey, and Madison, Illinois, as ordered by the Barber Company.

Beginning with and including the calendar year 1915 it is agreed that the kleets, delivered as hereinbefore stated, shall be purchased by the Barber Company at the following prices: * * *

It is further agreed that the Barber Company will feature and offer the Kontinuous Kant-Leak Kleets to the trade in connection with at least one of their brands of prepared roofing to the end of this agreement; provided, however, that this shall not be construed to apply to their Genasco or other high-grade roofing, in connection with which the original agreement and addendum of February 25, 1911, already provides, on the conditions therein specified, for the use of Kant-Leak Kleets.

It is agreed that the Barber Company shall have the right to sell both the Kant-Leak Kleets and the Kontinuous Kant-Leak Kleets purchased hereunder from the Kleet Company separately without roofing to any other persons or corporations.

This agreement is made in duplicate and shall form an addendum to and modification of and become a part of said agreement of March 15th, 1910, * * * which agreement was afterwards assigned to the Kleet Company and modified by an addendum entered into between the Kleet Company and the Barber Company, dated February 25, 1911. * * *

It is understood and agreed that all of the provisions of said agreement of March 15, 1910, as modified by said addendum of February 25, 1911, shall not only apply to the Kant-Leak Kleet but shall likewise apply to the Kontinuous Kant-Leak Kleet and the patent granted or to be granted under said application of June 13, 1913, except as herein modified. * * *

Genasco roofings," or goods of the same quality packed in private brands, and continued:

"It being the intent of this clause that in return for the exclusive sales rights, etc. acquired by the party of the second part, they will advertise and advocate the sale of their high-grade roofing packed with 'Kant-Leak Kleets,' as long as there is a substantial demand therefor."

Summarizing—as to exploitation, it agreed to "feature" and offer to the trade the cleats with a certain brand of high-grade roofing, to include favorable references to the cleat in its current advertising of roofing material, and to advocate its use and sale in such periodicals as it may deem advisable. This advertising and advocacy of the cleats to be to the extent deemed advisable by appellee, and to continue so long as there was a substantial demand for the cleats. The net result of this obligation is that appellee is to exploit the cleat in the various ways generally set forth, but the time for, instruments, and extent of this exploitation are not defined within any ascertainable limits. The appellee could do little or much in presenting the cleats to the trade, and yet be within the contract.

As to purchase of the cleats, it agreed to purchase in such quantities as might be necessary to fill its orders therefor, but expressly reserved "the right to pack and sell said goods with or without cleats or otherwise," as it "may desire." Appellee was not obligated to buy a single set of cleats unless it might desire to do so. The entire value to appellants of a contract of sale was the creation and satisfaction of a demand for the cleat. Those were the only subjects concerning which the appellee even pretended to bind itself, and in those regards it did not define its obligations. Nor can it be said that, although the four corners of the contract do not give this definition, they do point to where it can be found in extraneous facts, as where a contract is made to supply the needs of an established business. Here there was no established business in the legal sense in which that term is used in such connection. It is true that appellee had an established business in prepared roofing, and as a part thereof furnished roofing fasteners, but it did not agree unconditionally to substitute cleats as the fastener to be sent with all or any definite ascertainable portion of its roofing. On the contrary, it agreed to undertake to create a demand for this cleat, then practically a novelty. It did not bind itself to meet even the demand it might arouse. Nor can it be said that it assumed a business risk through an attempt to introduce a novelty, because it entirely controlled the manner and extent of that attempt.

The outcome of repeatedly expressed dissatisfaction by appellants with the small purchases by appellee was the addendum agreement of February 25, 1911. This agreement made several changes in the existing arrangement. Up to that time the appellee had offered its Genasco roofing with cleats at a higher price than with old style fastenings. To lessen this barrier to the sale of cleats, appellants agreed to reduce the price of cleats to appellee 2½ cents per set, and appellee agreed to lower its roofing price to the trade 5 cents per square, and to maintain the price at not to exceed 5 cents above that of the same grade of roofing offered with old style fastenings.

The uncontrolled option to pack the cleat with its Genasco roofing was replaced by a provision that the cleats should be packed with all high-grade roofing, except in those instances where the customer might demand the old style. The parties also agreed to co-operate in an advertising campaign during the year of 1911 through literature, samples, and demonstrating boards featuring the cleats. This advertising matter was to be prepared and furnished by appellee to its customers gratis. The cost thereof was to be equally divided; the extent thereof to be determined by the appellee, with a maximum expenditure fixed for appellants. The net results of this addendum agreement upon the contract of 1910 were, so far as appellee's obligations, as follows: It regulated the relative selling prices of high-grade roofing with cleats and with old-style fastenings; it replaced appellee's uncontrolled option to pack in one high-grade roofing (Genasco) by a requirement to use cleats in all its high-grade roofing, except where customer objected; and it provided for an advertising campaign during that current year. The first two requirements were fixed, definite, and beyond control of appellee; the last was controlled entirely by appellee.

For about eight months the parties proceeded under this arrangement, but not without friction. Appellants were still deeply disappointed at the amount of cleats ordered, and complained at length. Appellee suggested a lower price of cleats in return for its further reducing its price of roofing packed with cleats to that of roofing packed with nails and cement. Appellants contend they never agreed to this change. However that may be, the appellee made the reduction in roofing price and insisted on paying appellants for cleats upon the basis suggested. As to whether this deduction in cleat price was proper became a matter of difference between the parties. The sum thus involved reached, in 1914, the amount of over $13,000. Appellants were getting into financial straits. Woerheide had in the meanwhile invented a modification of the Kant-Leak Kleet, known as the "Kontinuous Kant-Leak Kleet," or "Klincher-Kleet." Under these circumstances the parties undertook to arrange for the past and future. This took form in a loan by appellee to appellants, a release by appellants of all claim on account of the above reduction of cleat price, and a contract, dated June 8, 1914, adding to and modifying the earlier amended agreement. While these three matters were disposed of at or about the same time, they were not so related that the other two entered into or formed any part of the contract then made. This last contract imposed upon appellee obligations as follows: To accept delivery of and purchase, during the remainder of the year 1914, 150,000 sets of cleats, to be furnished at rate of 25,000 sets per month, paying 20 cents per set for Kant-Leak and 17 cents per set for Kontinuous Kleets, delivered at Maurer, N. J., or Madison, Ill., as ordered by appellee, and to feature and offer Kontinuous Kleets with a brand of popular grade roofing until end of the agreement. By the concluding clause of this agreement "all of the provisions" of the prior amended agreement "shall likewise apply to the Kontinuous Kant-

Leak Kleet, * * * except as herein modified." Under this broad provision it is thought would be included the obligation to include favorable references to the Kontinuous Kleet in appellee's current advertising of roofing material, and to advocate its use and sale in such periodicals as it may deem advisable, the extent of such advertising and advocacy to be left to the sound judgment of appellee.

Treating the three agreements as one final agreement, a summary of the obligations of appellee thereunder is as follows: To feature and offer to the trade the two cleats (Kant-Leak with all of its high-grade roofing, and Kontinuous with a popular grade roofing) during the life of the patents; to include favorable references to both cleats in its current advertising of roofing material, and to advocate their use and sale in such periodicals as might seem advisable to appellee, such advertising and advocacy to continue during a substantial demand for the cleats, to the extent determined by the sound judgment of appellee; to pack Kant-Leak Kleets with all high-grade roofing, except where the customers might demand old-style fastenings; to maintain price of high-grade roofing so packed to within 5 cents per square of price with old-style fastenings; to purchase 150,000 sets (kind not specified) in last half of 1914 at monthly rate of 25,000 sets, delivered at Maurer, N. J., or Madison, Ill. (as ordered by appellee), at 20 cents per set for Kant-Leak Kleets and 17 cents for Kontinuous Kleets. Of these obligations, which are so uncertain or indefinite that they cannot be determined and enforced? The requirements to feature and offer the cleats to the trade are definite as to duration but uncontrolled as to manner or extent. The requirement to advertise and advocate their use is left undefined as to extent. The requirement to pack Kant Leak Kleets with all high-grade roofing except where customer demands old-style is definite in the sense that it is an application to an established business (sale of high-grade roofing with fastenings), the limits of which can be ascertained. The requirement as to maintenance of high-grade roofing price is definite. The requirement as to purchase of 150,000 sets in 1914 may have been indefinite in its terms, but it was performed in all substantial respects before any attempted rescission, and therefore must be regarded as definite. There is no requirement that appellee purchase any Kontinuous Kleets after 1914.

The contract was for the life of the patents, which would have continued, after the attack upon the contract, for about 11 years on the Kant-Leak Kleet and about 17 on the Kontinuous Kleet. It cannot be said that any of the above obligations are subordinate in importance. Each has a direct bearing upon the volume of the purchase and sale of cleats, which was the one main object of the contract. Each was a material element of the consideration for which appellants assumed the obligations upon their part. They have not been fully or substantially performed, and some of them are incapable of full performance short of the life of the contract. Several of them are not capable of measurement in case of breach, so that appellants could recoup therefor their damages. The contract therefore is void for uncertainty.

[2, 3] Appellee contends that the purchase of 150,000 sets during 1914 under the contract is such performance as to save the contract from rescission, while appellants deny that such purchase was in accordance with the contract requirements. Both positions are untenable. The basis of appellants' claim is that during the month of July, 20,500 instead of 25,000 sets were ordered; that appellee, during the fall of 1914, failed to feature and advertise the cleats promptly; and that the orders came near the end of the month when it was very difficult to fill them. It is true that only 20,500 sets were purchased in July, and that the contract required 25,000 sets, but 30,000 sets were ordered for August, and 25,000 or more every succeeding month, making a total of more than 150,000 sets. This was such an inconsequential breach as not to affect appellee's claim that, as to the number and monthly ratio, the performance was substantially in accord with the contract. As to the featuring and advertising, the contract requirement is so indefinite that almost any effort in good faith on appellee's part would meet its demand, and there is no suggestion therein as to when this should be begun or done. It may also be said that appellee does not seem to have been remiss in that regard when the war and business conditions are considered. As to the orders for cleats being given at or near the month end, there is no limit of this sort in the contract. On the contrary, it requires appellants to keep on hand at all times enough cleats to meet appellee's needs. Although appellee's performance of this part of the contract must be regarded as substantially complete, yet complete performance of only one of its five or six important executory contract obligations cannot prevent the avoidance of the contract, if others equally important remain executory and are legally uncertain. Santaella v. Lange, 155 Fed. 719, 84 C. C. A. 145; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696; Oakland Motor Co. v. Indiana Automobile Co., 201 Fed. 499, 121 C. C. A. 319; Velie v. Kopmeier, 194 Fed. 324, 114 C. C. A. 284; Hudson v. Browning, 264 Mo. 58, 174 S. W. 393; Higbie v. Rust, 211 Ill. 333, 71 N. E. 1010, 103 Am. St. Rep. 204; Killebrew v. Murray, 151 Ky. 345, 151 S. W. 662; Hopkins v. Iron Co., 137 Wis. 583, 119 N. W. 301. That every part of the consideration be definite or every part be indefinite is not the gauge of the validity of a contract. However, the law requires that the important, essential elements in the consideration be ascertainable with reasonable certainty. This is true because the law will not hold a party bound to a contract against his will, when the substance of what he is to get in return is executory, and is so shadowy in its outline that the other party can refuse to perform with impunity, since either the contract does not compel it, or no court can say what damage it has caused if it fail to act.

[4] Appellants, as a portion of their relief, ask an accounting. The facts reveal no basis for such. The evidence convinces that there has been substantial performance of the contract by both parties up to the date of attempted avoidance. The entire trouble is found in the contract itself. It was not at its making strong enough to hold, and it had not, through performance, become so up to the time appellants saw fit to withdraw therefrom.

The judgment should be reversed, with instructions to enter a decree declaring the contracts void, and the appellee without further right to use or sell cleats manufactured under the above patents, except such as it may have on hand at the date of said decree, and perpetually enjoining appellee from further institution or prosecution of suits or actions relating to said letters patent for the purpose of having any devices adjudged infringements thereof.

MUNGER, District Judge (dissenting). In my view of this case, the agreement of the Barber Company to purchase the cleats in sufficient quantities to fill its orders therefor, to offer and sell the Genasco and private brands of roofings supplied exclusively with the cleats, except where the customers demanded the old-style fastenings, and to purchase and accept delivery of 150,000 sets of cleats in 1914 at a fixed price, were definite and enforceable obligations on its part, so that there was no entire lack of mutuality of obligations. I think the case is governed by the decision of this court in' Conley Camera Co. v. Multiscope & Film Co., 216 Fed. 892, 133 C. C. A. 96. It was not necessary that each covenant of one party to the contract had a corresponding covenant of the other party apportioned to that covenant, as one item of consideration was sufficient to support all the promises of appellant. Mississippi River Logging Co. v. Robson, 69 Fed. 773, 16 C. C. A. 400; Staples v. O'Neal, 64 Minn. 27, 65 N. W. 1083; In re Desnoyers Shoe Co. (D. C.) 110 Fed. 533; Sax v. Detroit, G, H. & M. Ry. Co., 125 Mich. 252, 84 N. W. 314, 84 Am. St. Rep. 572; Smith v. St. Paul & D. R. Co., 60 Minn. 330, 62 N. W. 392; Miller v. Board of Com'rs, 17 Colo. App. 120, 67 Pac. 347; Elliott on Contracts, § 231.