# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

UNITED STATES v. BEAN, County Treasurer.

(Circuit Court of Appeals, Eighth Circuit. September 2, 1918.)

No. 5078.

1. INDIANS ⊜⊸15(2)—INDIAN LANDS—ALIENATION.
   After Act April 26, 1906, c. 1876, § 22, and Act May 27, 1908, c. 199, § 9, lands of all full-blood Seminole Indian heirs were inalienable, save on approval of the court, etc.

2. TAXATION ⊜⊸6—STATE TAXES—GOVERNMENT INSTRUMENTALITIES.
   It is the universal rule that every instrumentality lawfully employed by the United States to execute its constitutional laws and exercise its lawful governmental authority is necessarily exempt from state taxation or interference.

3. TAXATION ⊜⊸181—INDIAN LANDS.
   Lands of full-blood Seminole Indian heirs, inalienable under Act April 26, 1906, c. 1876, § 22, and Act May 27, 1908, c. 199, § 9, are not subject to state taxation, notwithstanding provisions in each of the acts that all lands upon which restrictions are removed shall be subject to taxation.

4. TAXATION ⊜⊸611(8) — RESTRAINING COLLECTION — JUDGMENT — INCONSISTENCY.
   In a suit by the United States to enjoin the county treasurer of an Oklahoma county from selling or conveying allotted lands formerly owned by the Seminole Nation on account of taxes levied, a decree that all lands belonging to enrolled citizens of the Seminole Tribe, except homesteads then owned by the original allottees, which were alienable at the times of the assessments, were taxable, and that upon conveyance of all such lands, including homesteads, the same were taxable, held not erroneous, in that the two clauses were inconsistent.

5. TAXATION ⊜⊸181—INDIAN LANDS.
   While homesteads of Seminole allottees were not subject to taxation, both because inalienable and by reason of the direct terms of the Seminole Agreement, yet when the restrictions on alienation were removed, and the homesteads became alienable, they were subject to taxation whenever the allottees disposed of them.

6. EQUITY ⊜⊸364—PROPRIETY OF DISMISSAL—DEFECT OF PARTIES.
   A court of equity will on its own motion dismiss a bill, if to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties.

7. JUDGMENT ⊜⊸17(1)—JURISDICTION—AUTHORITY OF COURTS.
   A court may not directly adjudicate a person's claim of right, unless he is actually or constructively before it.

⊜⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

253 F.—1

8. PARTIES ⬤⟳32—"INDISPENSABLE PARTIES"—WHO ARE.

An "indispensable party" is one who has such an interest in the sub-ject-matter of the controversy that a final decree cannot be made, without affecting his interests or leaving the controversy in such a situation that its final determination may be inconsistent with equity and good con-science.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Indispensable Party.]

9. TAXATION ⬤⟳611(4)—COLLECTION—INJUNCTION—PARTIES.

Where purchasers of lands formerly belonging to the Seminole Nation, which had been sold for taxes, were not made parties to a suit by the United States against the treasurer of the Oklahoma county in which the lands lay to enjoin him from collecting the taxes and from selling or conveying the lands, the suit must be dismissed for the want of such parties, for they are indispensable.

Appeal from the District Court of the United States for the East-ern District of Oklahoma; Ralph E. Campbell, Judge.

Suit by the United States against G. E. Bean, County Treasurer of Seminole County, Okl. From the decree, the United States ap-peals. Reversed and remanded, with directions.

W. P. McGinnis, U. S. Atty., of Muskogee, Okl. (C. W. Miller, Sp. Asst. U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

T. S. Cobb, J. H. Cobb, and A. M. Fowler, all of Wewoka, Okl., for appellee.

Before SANBORN and CARLAND, Circuit Judges, and BOOTH, District Judge.

SANBORN, Circuit Judge. The United States brought this suit to prevent the county treasurer of Seminole county, Okl., from sell-ing or conveying certain allotted lands formerly owned by the Sem-inole Nation or Tribe of Indians, on account of taxes levied thereon by the officers of those counties for the fiscal years ending June 30, 1910, June 30, 1911, June 30, 1912, June 30, 1913, and June 30, 1914. The court below rendered a decree, by which it classified the lands, enjoined the county treasurer from selling or conveying on account of those taxes the lands it adjudged not legally subject thereto, and dismissed the bill as to those lands which it found to be lawfully sub-ject to such taxes. The United States has appealed, and specified several alleged errors.

The agreement between the United States and the Seminole Na-tion or Tribe of Indians, ratified by Act July 1, 1898, c. 542, 30 Stat. 567, 568, provides for the division, allotment, and conveyance of the lands of that nation to the enrolled members thereof in severalty, so that each member shall receive land of the same value as near as may be as the value of that which every other member receives.

It declares that each shall receive a deed of his allotment and that:

"Each allottee shall designate one tract of forty acres, which shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity."

For convenience the tract thus selected by an allottee is called his homestead, and the remainder of his allotment his surplus land. Section 8 of the act of March 3, 1903 (32 Stat. 1008, c. 994), provides:

"That the homestead referred to in said act [the act of July 1, 1898, just cited] shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the deed for the allotment."

Act May 27, 1908, c. 199, 35 Stat. 312, 313, is a comprehensive declaration of the status as to restrictions upon alienation of the numerous classes of allotted lands formerly held by the Five Civilized Tribes, and section 4 of that act provides:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

[1] Counsel for the United States assign the third and fifth paragraphs of the decree as error. Those paragraphs read in this way:

"(3) That all inherited homestead allotments, where the allottees died prior to April 26, 1906, which were owned by said heirs during said fiscal years, were alienable and taxable during said years, regardless of whether said heirs were enrolled as full-blood Indians, or of less Indian blood."

"(5) That all allotments, both surplus and homestead, made after the death of the enrolled Seminole citizens, whether owned by full-blood heirs, or by heirs of less Indian blood, were alienable and taxable during said fiscal years, whether the death of the enrolled citizens or the selections of allotments were made before or after April 26, 1906."

The court below made these findings and rendered this decree before the decisions of the Supreme Court in Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 286, 287, 62 L. Ed. 591, and Talley v. Burgess, 246 U. S. 104, 38 Sup. Ct. 287, 288, 289, 62 L. Ed. 600, were handed down. Conceding that prior to the passage of the act of April 26, 1906 (34 Stat. 137, c. 1876), the land described in these findings were alienable, it must now be held, in deference to the opinions in these cases, that section 22 of the act of April 26, 1906, which subjected all conveyances of adult full-blood Indian heirs to the approval of the Secretary of the Interior, and all conveyances of minor full-blood Indian heirs to the approval of the court, and section 9 of the act of May 27, 1908 (35 Stat. 312, 315), which subjected all conveyances of full-blood Indian heirs to the approval of the court having jurisdiction of the estate of the deceased allottee, rendered the lands of all full-blood Seminole Indian heirs inalienable during the fiscal years for which the taxes here in controversy were levied. David v. Youngken, 250 Fed. 208, —— C. C. A. ——, C. C. A. 8th Circuit, filed April 3, 1918; Harris v. Bell, 250 Fed. 209, —— C. C. A. ——, C. C. A. 8th Circuit, filed April 30, 1918.

[2, 3] Were these inalienable lands of the full-blood Indian heirs taxable for the fiscal years 1910, 1911, 1912, 1913, and 1914? Counsel for the treasurer of the county argue that they were because Congress provided in section 19 of the act of April 26, 1906 (34 Stat. 137), that "all lands upon which restrictions are removed shall be subject to taxation," and by the act of May 27, 1908 (35 Stat. 312),

that "all lands from which restrictions have been or shall have been removed shall be subject to taxation and all other civil burdens." But this contention is overborne by the fact that by these very acts of Congress restrictions upon the alienation of these lands while held by full-blood Indian heirs were imposed, and these lands were held in trust by the United States for these heirs, and made one of the instrumentalities of the government of the United States by which it pursues its wise policy of protecting Indians from the unrestrained greed, rapacity, and cunning of the members of the white race, and of seeking to induce them to cultivate the soil, to practice the arts of civilized life, and become provident and useful citizens. The lands of the full-blood Indian heirs were not lands from which restrictions had then been removed. They were lands upon which restrictions were imposed by these very acts, and it is not probable that the legislators intended to impose taxes upon lands of Indians which the United States was holding for them, while it withheld from them the power of disposition, for such a course runs counter to its public policy and practice from the foundation of the government.

Counsel call attention to the fact that there is no provision in the agreement with the Seminole Nation that any of the lands to be allotted to the members of the tribe, except the homesteads, should be free from taxation while they remained inalienable. But when that agreement was made they were free from taxation, and those who made the agreement knew that the settled policy and practice of the United States was to protect the members of the tribe and all the property which it held the control and disposition of for them free from taxation until it granted them full power of disposition thereof. And it was doubtless for that reason that no stipulation was inserted in the treaty on the subject, except that the 40 acres to be selected by each member of the tribe for a homestead should be "nontaxable as a homestead in perpetuity." 30 Stat. 567, 568. So it was that the imposition of the restrictions upon alienation by these acts of 1906 and 1908 upon the lands of the full-blood Indian heirs brought these lands under the universal rule that every instrumentality lawfully employed by the United States to execute its constitutional laws and to exercise its lawful governmental authority is necessarily exempt from state taxation or interference. United States v. Rickert, 188 U. S. 432, 437, 438, 439, 23 Sup. Ct. 478, 47 L. Ed. 532; United States v. Thurston County, 143 Fed. 287, 289, 290, 74 C. C. A. 425. The provisions of the acts of 1906 and 1908, cited by counsel for the treasurer, are therefore so inconsistent with the imposition of the restrictions by these acts upon the alienation of the lands of full-blood Indian heirs and the legal effect of that imposition, that Congress could not have intended that they should apply to those lands, and the true construction of the acts which contain them undoubtedly limits their application and effect to other land. The result is that the allotments of Seminole lands owned and held during the fiscal years 1910, 1911, 1912, 1913, and 1914 by full-blood Indian heirs were instrumentalities of the United States re-

served and used by it to execute its laws and to exercise its governmental powers, and they were exempt from taxation by the state of Oklahoma, or any of its counties, cities or other governmental subdivisions.

[4, 5] It is assigned as error that the court below also adjudged:

"That all lands belonging to enrolled citizens of the Seminole Tribe of Indians, except homesteads then owned by the original allottees, which were alienable by such enrolled citizens at the times of the assessments for taxation for the fiscal years ending June 30, 1910, June 30, 1911, June 30, 1912, June 30, 1913, and June 30, 1914, were taxable and that upon conveyance of all such lands, including homesteads by said enrolled citizens the same were taxable thereafter."

The objection to this declaration is that the last clause thereof is inconsistent with the first. But a careful reading and consideration of the paragraph has satisfied that there is no real inconsistency in it. The first clause declares that all alienable surplus lands owned by the original allottees during the fiscal years 1910, 1911, 1912, 1913, and 1914 were taxable, and the second clause declares that these surplus lands, and also the homesteads of such enrolled citizens which were actually lawfully alienated, were taxable after such alienation. No error is perceived in this conclusion. The only exemption from taxation of the surplus lands arose from the restrictions upon their alienation. Wherever, therefore, those lands were or became alienable, they were or became taxable. The exemption of the homestead of an allottee arose from two sources: (1) The restrictions on its alienation; and (2) the provision of the Seminole Agreement that it "shall, by the terms of the deed, be made inalienable and nontaxable as a homestead in perpetuity." But when the restrictions on alienation were removed by act of Congress, and the homestead became alienable, the allottee then had the option to retain it as a homestead exempt from taxation, or to surrender his right to it as a homestead and its exemption from taxation, to convey it and receive the consideration for its sale. If he chose the latter alternative, then the land which had been his homestead was no longer such, and it was thereafter taxable. Sweet v. Schock, County Treasurer, 245 U. S. 192, 38 Sup. Ct. 101, 102, 103, 62 L. Ed. 237.

[6-9] The questions presented by counsel for the parties to this suit have been considered, and the opinion of the court regarding them has now been expressed. But the record presents a case which deprives both that expression and the opinion of the court below of the conclusiveness of an adjudication. That record consists of a complaint, a motion to dismiss the complaint on the ground that it does not contain allegations sufficient to entitle the plaintiff to the relief prayed for, or to any other relief, a stipulation between the United States and the county treasurer, by their respective attorneys, that the case may be submitted to the court upon certain stipulated facts, which are immaterial to the subject now to be considered.

The only parties to the suit are the United States and the county treasurer of Seminole county. The plaintiff alleges in its complaint, among other things, that the county treasurer has sold all the tracts

of land which are the subject of this suit,· for the taxes levied thereon for the years 1910, 1911, 1912, 1913, and 1914, and has executed and delivered certificates of sale to the purchasers thereof who have paid therefor; that when no one bid the amount of the tax on any tract it was bid in for and a certificate of sale was executed by him to the county; that many of the latter certificates have been purchased from the county by various persons and have been transferred to such purchasers and are now held by them. The decree enjoins the county treasurer from collecting any of the' taxes levied on the lands inherited and owned by the enrolled citizens of the Seminole Nation which the court found to be inalienable and nontaxable for the fiscal years 1910, 1911, 1912, 1913, and 1914, and it adjudges that the taxes levied and assessed, and each, every, and all tax sale certificates and certificates of purchase upon or concerning the aforesaid nontaxable and inalienable lands be, and they are annulled; that whatever liens, charges, or incumbrances the assessments, tax levies, and tax sale certificates might constitute against said land be, and the same are, annulled; and that all incumbrances upon the title to the lands created thereby are removed.

From the complaint and the decree the facts conclusively appear that this suit has been commenced, prosecuted, and a decree has been rendered against the party who has no real interest in the property in litigation, and that none of the real parties in interest adverse to the claim of the complainant have been made parties to the suit, or have appeared or been heard therein. The taxes of which complaint is made have been levied, the lands upon which they were levied have been sold to pay them, certificates of the sales thereof have been executed and delivered, the certificates and any liens they evidence are held either by the county, or by other purchasers at the sales, or from the county, or by their successors in interest; but neither the county (Revised Laws Oklahoma, § 1501), nor any of the purchasers at the sales, nor any of the holders of the certificates of sales, are parties to this suit, and as they have not been made parties, and have not been heard, or had any opportunity to be heard in this suit, nothing that the court below has adjudged and nothing that this court has decided herein is or can be binding upon them, or upon any parties claiming under them, or even upon the court below, or upon this court, when, if ever, the' claims, rights, and interests of these parties who are not present in either of the courts are presented by them for adjudication.

But the decree, by its terms, annuls their certificates, destroys the liens they claim, removes all these as clouds upon the titles, without · any notice to or hearing by them, and this decree doubtless has been, or, if permitted to stand,· will be, spread upon the records of the titles to these lands. It cannot fail injuriously to affect—nay, practically to destroy—the value of the claims and rights of these holders of certificates, because it bears on its face no adequate notice that they are not bound by it. "The established practice of courts of equity to dismiss the plaintiff's bill," says the Supreme Court, in Minnesota v. Northern Securities Co., 184 U. S. 199, 235, 22 Sup. Ct.

308, 322 (46 L. Ed. 499), "if it appears that to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties to the suit, is founded upon clear reasons, and may be enforced by the court sua sponte, though not raised by the pleadings or suggested by the counsel. Shields v. Barrow, 17 How. 130 [15 L. Ed. 158]; Hipp v. Babin, 19 How. 271, 278 [15 L. Ed. 633]; Parker v. Winnipiseogee Lake Cotton & Woolen Co., 2 Black, 545 [17 L. Ed. 333]." To the same effect is the opinion of this court in Hawes v. First Nat. Bank, 229 Fed. 51, 57, 59, 143 C. C. A. 645, 651, 653.

It is a familiar and just rule that no court may directly adjudicate a person's claim of right, unless he is actually or constructively before it. It is an established rule of practice in the conduct of suits in equity in the federal courts that every indispensable party must be brought into the court or the suit must be dismissed. And an indispensable party is one who has such an interest in the subject-matter of the controversy that a final decree cannot be made without affecting his interests, or leaving the controversy in such a situation that its final determination may be inconsistent with equity and good conscience. Seminole County and each of the other holders of certificates of sale or of liens which they claim upon any of the lands described in the complaint which the plaintiff seeks to affect by this decree, was an indispensable party to this or any suit to avoid or injuriously affect his certificate or claimed lien. And as Justice Curtis said in Shields v. Barrow, 58 U. S. (17 How.) 130, 138, at 141 (15 L. Ed. 158):

"It being clear that the Circuit Court could make no decree, as between the parties originally before it, so as to do complete and final justice between them without affecting the rights of absent persons," the original bill ought to have been dismissed.

See Ribon v. Railroad Companies, 83 U. S. (16 Wall.) 446, 450, 451, 21 L. Ed. 367; Bank v. Carrollton Railroad, 78 U. S. (11 Wall.) 624, 630, 631, 20 L. Ed. 82; Bogart v. Southern Pacific Co., 228 U. S. 137, 146, 147, 33 Sup. Ct. 497, 57 L. Ed. 768; Chadbourne v. Coe, 51 Fed. 479, 481, 2 C. C. A. 327, 329; Howe v. Howe & Owen Ball Bearing Co., 154 Fed. 820, 828, 83 C. C. A. 536, 544; United States v. United Shoe Machinery Co. (D. C.) 222 Fed. 349, 408.

Let the decree below be reversed, and let the case be remanded to the court below, with directions to dismiss the suit for want of indispensable parties, unless within a short time, to be fixed by the court below, some of the indispensable parties are made parties to the suit, and in case the latter course is pursued, and the plaintiff should then be found entitled to any relief, to specifically limit the terms and effect of the decree to the interests of those indispensable parties, who are later made parties to the suit.