## UTILITIES PRODUCTION CORPORATION v. CARTER OIL CO.

## CARTER OIL CO. v. UTILITIES PRODUCTION CORPORATION.

### Nos. 874, 875.

Circuit Court of Appeals, Tenth Circuit.
Aug. 4, 1934.

minerals were reserved to the Tribe, leases thereof to be made by the tribal council and approved by the Secretary of the Interior. The Utilities Production Corporation, plaintiff below and herein referred to as the gas lessee, owns the lease of the gas rights in 166,400 acres. The Carter Oil Company, defendant below and herein referred to as the oil lessee, owns leases of the oil rights in 640 acres. Casing-head gas is gas produced in the drilling of oil wells, and is saturated with gasoline. The gasoline is recovered from the gas through casing-head gas plants, and the residuum of dry gas is called "residue gas." Broadly speaking, the oil lessee is entitled to so much of this residue gas as it may need for operating or developing the lease producing the gas and adjoining leases. The gas lessee is entitled to the balance, at its option, upon payment of a compressing charge to the oil lessee and a royalty to the Tribe. This litigation involves the question of whether the oil lessee is entitled to use this residue gas for particular purposes, or whether it must account to the gas lessee for gas so used. An effort was made to get the Interior Department to settle the controversy under its power, reserved in the leases, to make regulations amendatory thereof, but this the Department declined to do because of its understanding that "a friendly suit for the purpose of determining the legal rights of the parties" was contemplated. This is that suit.

The two leases are separate instruments; the Osage Tribe is lessor in each, and the parties herein respectively lessees. The one grants and leases "all the oil deposits"; the other "all the gas deposits." Each lease refers to the other, and provision is made that if the oil lessee brings in a gas well, the gas lessee shall be entitled to the well upon paying the expense thereof; the converse is likewise provided. Each is subject to regulations "now or hereafter" prescribed by the Secretary, with certain limitations not here pertinent. With this interlocking arrangement, the two leases and the regulations must be construed together, as integral parts of one plan to lease the minerals of the Tribe to the best advantage.

So construing them, and applying the settled rule that all parts of agreements should be given effect if reasonably possible to do so,[1] the solution of the controversy

Elmer J. Lundy, of Tulsa, Okl. (Francis E. Matthews and Joseph R. Harmon, both of Chicago, Ill., and Poe, Lundy & Morgan, of Tulsa, Okl., on the brief), for Utilities Production Corporation.

James A. Veasey, of Tulsa, Okl. (S. J. Montgomery, of Tulsa, Okl., on the brief), for Carter Oil Co.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

Under the Osage Indian Allotment Act (Act of June 28, 1906, 34 Stat. 539) the

---

[1] "No part should perish by construction." Judge Walter H. Sanborn in Uinta Tunnel Min. & Transp. Co. v. Ajax Gold Min. Co. (C. C. A. 8) 141 F. 563, 567; Pressed Steel Car Co. v. Eastern R. Co. of Minnesota (C. C. A. 8) 121 F. 609, 611; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co. (C. C. A. 8) 64 F.(2d) 224, 228, 89 A. L. R. 238; Williston on Contracts, § 619.

turns upon an application of one section of the oil lease and two regulations. They are:

Section 12 of the oil lease deals with raw casing-head gas, that is, the gas before the gasoline is extracted. It provides:

"All casing-head gas shall belong to the oil lessee and when used for the manufacture of gasoline shall be metered and be subject to a royalty of 16 2-3 per cent based on the market value of the gasoline contents, and all such gas not utilized by the oil lessee on his leased premises or for operating other adjoining leases within the Osage Reservation, shall belong to the gas lessee, subject to the prescribed royalty of 16 2-3 per cent."

Paragraph 49 of Amendments to Regulations Approved May 13, 1919, effective June 7, 1919, deals with residue gas—the dry gas after the gasoline has been extracted. That paragraph defines when an oil well is deemed to produce gas in commercial quantities; it then excepts casing-head gas in this language:

" * * * Except when gas from such well contains gasoline in commercial quantities, in which event it shall be termed 'casing-head gas' but only when, and only while actually used for the manufacture of gasoline, as provided for under paragraph 12 of the oil lease. Any casinghead gas coming direct from the wells and not utilized by the oil lessee as above provided for, or for operations as provided for in section 12 of the oil lease shall be delivered to the gas lessee at a central point on the oil lessee's gathering or carrying lines, at the same schedule of prices as fixed for delivery of residue gas at gasoline plants into the line or lines provided by the gas lessee; *also all gas after extraction of gasoline, and not used for operations under the terms of paragraph 12 of the oil lease, shall be delivered to gas lessee at points where the gasoline is extracted* at as high a pressure as the efficient operation of such plant will permit and where same is delivered at a pressure not above fifty pounds the oil lessee shall receive one cent per thousand cubic feet and an additional one-half cent increase for each additional 50 pounds pressure not exceeding three cents per thousand cubic feet. Settlement for same to be made on or before the twentieth day of each month for all gas delivered during the preceding month and to be computed on the usual basis of ten ounces above atmospheric pressure, provided that royalty on such gas shall be computed the same as though it were gas produced and utilized by the gas lessees under the terms of their leases from their wells proper, and provided further, that the rights herein conferred are optional and in no event shall the gas lessees be obligated to utilize or pay the oil lessee, or pay royalty to the tribe, if not utilized, for any such gas as is described in this amendment; and if the gas lessee does not accept such gas and utilize the same after tender thereof by the oil lessee, then such gas may be otherwise disposed of by the oil lessee upon the same basis of royalty as fixed in case of utilization by the gas lessee. In case of combination wells where the gas lessee has no market for and does not utilize such gas for any purpose, the oil lessee shall be permitted to utilize and sell the same to adjoining lessees for operating purposes until such time only as the gas lessee is in a position to and does utilize such gas." (Italics supplied.)

Regulations approved July 23, 1919, provide for royalties on the casing-head gasoline manufactured by oil lessees. Section 11 reads:

"The residue or dry gas remaining after extracting the gasoline, not used for developing purposes on the leases where it was produced or adjoining leases in Osage County, shall be delivered to the gas lessee as provided in amended paragraph 49 of the rules and regulations governing leases in Osage County, and all contracts for the sale of casing-head gas shall contain a provision to such effect."

 Other provisions of the leases and regulations permit gas to be used for certain operations royalty free, but provide for royalties to the Tribe on gasoline extracted from casing-head gas, and on the residue gas not used for such operations. We are concerned here with residue gas only, and the leases and regulations, construed together, leave no room for reasonable doubt that the oil lessee is entitled to use such gas for operating or developing the leases from which it was produced and adjoining leases of the oil lessee within the Reservation. Standing alone, section 12 of the lease gives to the gas lessee only such raw casing-head gas as may not be used for the manufacture of gasoline or utilized by the oil lessee on the lease or those adjoining. The argument that, having title to the raw gas used for manufacture, the oil lessee has title to the gasoline and dry gas produced from the raw gas, overlooks the fact that this lease was expressly subject to later regulations, and that a later regulation makes a specific disposition of the dry or residue gas.

This brings us to the real question in the case: Do the uses to which the oil lessee has put this residue gas fall fairly within the ambit of operations or development as the

terms are used in the lease and regulations? We take up the items separately.

**1. *Repressuring of oil wells.*** When an oil well plays out, it is not because all the oil has been recovered, but because the gas or water pressure has been exhausted. When the strata overlying an oil sand is penetrated by the drill, the gas within the formation, being under pressure, seeks the outlet, carrying with it the oil. When that pressure is gone, there is nothing left to bring the oil within reach of the pump, except gravity, the operation of which is limited to upper strata of the sand, and there counteracted by properties of viscosity, capillarity and adhesion of oil to its mother sand. Oil is produced by the lateral thrust of the gas pressure to the hole, and, after it quits flowing, the vertical lift of the oil to the top by a pump. Many years ago it was conceived that played-out wells could be given a new lease on life by injecting gases or liquids under pressure into the oil sands, thus starting the cycle anew. This is accomplished by forcing gases or liquids into one of the exhausted wells on a lease, or into a master-hole drilled for the purpose. The gas, seeking an avenue of escape, percolates through the sands to the outlets—the other wells on the lease—carrying oil with it. Bulletin 148, Department of Interior, 1917; Champlin Refining Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; Bandini Petroleum Co. v. Superior Court, 284 U. S. 8, 52 S. Ct. 103, 76 L. Ed. 136; Russell v. Walker, 160 Okl. 145, 15 P. (2d) 114.

The operation or development of an oil lease requires that the oil in the sands be brought to the top of the ground. Moving the oil laterally is as important a part of the work as moving it vertically. It is conceded that residue gas may be used to lift it *from* the bottom of the hole; no reason is suggested why moving it *to* the bottom of the hole is not likewise a part of the operation or development of a lease.

The gas lessee's main argument, on this point, is that the use of gas for this purpose was not known in the Osage Nation when the oil lease permitting use of raw casing-head gas was made in December, 1918, or when the use of residue gas for operations and development was permitted by regulation in 1919; that the parties could not and did not contemplate, by the words "operations" and "development," any use except that known to the industry in Oklahoma at that time. The argument is not sound, either in fact or law. The use of gas for repressuring was so widely known in the industry by 1917—two years before the Regulations were adopted—that the Interior Department had prepared and issued a bulletin of 120 pages on the general subject. Repressuring was in common use in the Appalachian fields in 1916. That there was no present need for it in the Osage field in 1919 does not lead to the conclusion that the Secretary of the Interior, who approved the lease for the lessor, the oil lessee, a West Virginia corporation, and the gas lessee, a Delaware corporation, were in ignorance of practices common in the eastern oil fields and of bulletins put out by the Interior Department.

But the argument that the parties contemplated the use of gas only for such methods of operation and development as were known to the industry the day the leases were signed, is specious. It imputes to the parties an intention to encase themselves, during the terms of the leases, in a straight-jacket. The oil business, then and now, is one in which changes come with lightning-like rapidity. A review of the patent causes in the courts discloses the frequent and radical changes made in the methods of oil operations and development. The argument leads to the conclusion that residue gas could not be used even for drilling if the lessee used any improvement in drills or casing-shoes which was invented after the lease was made. Such a foreshortened intent cannot be imputed to the parties, for they knew that improvements would come about during the terms of the leases, and must have contemplated the use of such improved methods. In fact, the lessor would doubtless have just cause to complain if an inefficient operation of the leases resulted from the failure of the lessees to use improved methods which came in common use during the terms of the leases.

If support be needed for a proposition so plain, it may be found in Bassell v. West Virginia Central Gas Co., 86 W. Va. 198, 103 S. E. 116, 117, 12 A. L. R. 1398, where a gas lessor complained because his lessee used methods for increasing the gas flow which were not known when the lease was made. The complaint was held to be without substance, the court saying:

"He executed the lease and conferred this right in an age of rapid and startling invention which wrought its wonders and transformations in no department of human activity more suddenly, progressively, and radically than in mining, transportation, and enlargement of enterprises and undertakings. Parties to contracts are held, in the absence

of agreements to the contrary, to have contemplated modifications of their relations under their contracts, by the development of improvements and new methods in the progress of science and invention. 'The common law is the living science of justice, and adopts the application of fixed principles to changes in the affairs of men.' Mr. Justice Mitchell, in Saltsburg Gas Co. v. Borough of Saltsburg, 138 Pa. 250, 259, 20 A. 844, 10 L. R. A. 193."

The trial court was right in denying the gas lessee's claim for residue gas used for repressuring wells on the lease from which it was produced, or those adjoining.

2. *Gas used as fuel in the casing-head gasoline plant.* In its bill, the gas lessee complains that the oil lessee "has used a portion of the residue [gas] as fuel in the operation of its gasoline plant." The leases and regulations clearly contemplate that the gasoline content of casing-head gas shall be conserved for the use of the Tribe. The oil lessee is accorded the right to extract the gasoline from the gas. Some of the oil recovered is in liquid form; some in saturation with gas. To recover the latter, an additional step—separation from the gas—is necessary, a step as essential as lifting crude oil to the surface. Such separation requires compressors and a gasoline plant, which require fuel for their operation. Section 1 of Regulations approved July 23, 1919, reduces the royalty on casing-head gas to be paid by the oil lessee, as an inducement to it to construct and operate casing-head gasoline plants.

Extraction of the gasoline being clearly contemplated as a part of the operation or development of an oil lease by the oil lessee, the use of residue gas as fuel for the extraction plant falls fairly within the terms of the lease and regulations.

### The Cross-Appeal.

The trial court decreed that the oil lessee should account to the gas lessee for residue gas theretofore used by the oil lessee for operating and developing leases owned by it within the Osage Reservation which were not adjoining—touching—the leases from which the gas was produced; and also for residue gas delivered by the oil lessee to other parties as a bonus for selling their casing-head gas to the oil lessee. From this part of the decree, the oil lessee appeals.

It is not contended in this court that such use of residue gas is permitted by Paragraph 49 of the Regulations approved May 13, 1919, or by Paragraph 11 of the Regulations approved July 23, 1919. Clearly it is not, for bonus gas is not used for development or operating its own leases; and a lease which does not touch does not adjoin. It is contended, however, that since the gas lessee has the option to decline to take the residue gas, with the accompanying obligation of a royalty to the Tribe and a service charge to the oil lessee, the regulation is void for uncertainty. The cases cited[2] involve contracts without consideration, the agreement of one party being so indefinite as to impose no obligation upon him. The leases here are supported by ample consideration. Nor is the provision indefinite or uncertain. The real complaint is that the option is unfair to the oil lessee, in that it does not require the gas lessee to give notice of its intention to take or cease taking, nor require a taking for a definite time. There is no present basis for complaint in this regard, for the gas lessee has demanded all of the residue gas in dispute and tendered payment therefor. If cause for complaint on this score arises in the future, doubtless it can be taken care of by an amendment to the regulation; if not, it will then be time enough to discuss the rights of the parties.

We are of the opinion that the decree below determined the rights of the parties in accordance with the leases and pertinent regulations.

While the point was not raised below or here,[3] we have been reluctant to construe these leases and the regulations in the absence of the Osage Tribe or the Secretary of the Interior, parties thereto. We have not, and cannot, adjudicate the rights of the Tribe in this litigation. The decree below does not act prospectively; injunctive relief was denied, and the only relief granted was a money judgment for the value of residue gas theretofore used by the oil lessee for certain purposes, which was held to be the property of the gas lessee. Even as to the past, the

[2] Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C. C. A. 8) 114 F. 77, 57 L. R. A. 696; Oakland Motor Car Co. v. Indiana Automobile Company (C. C. A. 7) 201 F. 499; Woerheide v. Barber Asphalt Paving Company (C. C. A. 8) 251 F. 196; Nebraska Aircraft Corp. v. Varney (C. C. A. 8) 282 F. 608; Weston Paper Mfg. Co. v. Downing Box Company (C. C. A. 7) 293 F. 725; United Fuel Gas Co. v. Swiss Oil Corporation (C. C. A. 6) 41 F. (2d) 4.

[3] The court may raise the question, sua sponte. United States v. Bean (C. C. A. 8) 253 F. 1.

decree does not bind the Tribe; it is open to it to claim, for example, that it has been deprived of royalties on residue gas by an improvident use of it for repressuring purposes—that the oil recovered by that process was not worth the gas expended in the recovery; or any other claim it has to make against either lessee.

At the same time, we have construed two words in leases to which the Osage Tribe is a party, and in its absence; and while the decree does not bind it, the opinion will be an authority if later litigation ensues. It would have been better practice to have made the Tribe a party. While both parties disclaim knowledge as to the means of getting all parties into court in one litigation, the record does not disclose such impossibility.

 While there is some lack of uniformity in nomenclature, the rules as to parties are well settled. A party is "indispensable"[4] if a decree cannot be entered without injuriously affecting his rights, or leaving the controversy in a situation inconsistent with equity and good conscience. An indispensable party should either be joined or the case dismissed. Franz v. Buder (C. C. A. 8) 11 F.(2d) 854; Skeen v. Lynch (C. C. A. 10) 48 F.(2d) 1044, certiorari denied 284 U. S. 633, 52 S. Ct. 17, 76 L. Ed. 539; South Penn Oil Co. v. Miller (C. C. A. 4) 175 F. 729. The reason underlying this rule is that courts cannot adjudicate rights of a party in his absence; it is most frequently applied in cases where title to a thing must be fully determined, or a will finally construed, and where all parties in interest may be brought in by substituted service.

Others having an interest in the subject-matter of the litigation and whose rights therein may conveniently be determined but need not be, are "proper" parties.[5] The rule as to them is one of propriety and not of jurisdiction. Chief Justice Marshall said, in this regard:

"It is contended, that he is a tenant in common with others, and ought not be permitted to sue in equity, without making his co-tenants parties to the suit. This objection does not affect the jurisdiction, but addresses itself to the policy of the court. Courts of equity require, that all the parties concerned in interest shall be brought before them, that the matter in controversy may be finally settled. This equitable rule, however, is framed by the court itself, and is subject to its discretion. It is not, like the description of parties, an inflexible rule, a failure to observe which turns the party out of court, because it has no jurisdiction over his cause; but being introduced by the court itself, for the purposes of justice, is susceptible of modification, for the promotion of those purposes. * * * In the exercise of its discretion, the court will require the plaintiff to do all in his power to bring every person concerned in interest before the court. But if the case may be completely decided as between the litigant parties, the circumstance that an interest exists in some other person, whom the process of the court cannot reach, as, if such party be a resident of some other state, ought not prevent a decree upon its merits." Elmendorf v. Taylor, 10 Wheat. 152, 166, 6 L. Ed. 289.

The equity rules embody the substance of this principle. Equity Rule 39 (28 USCA § 723). Rule 44 (28 USCA § 723) gives the court power, where there is a defect in the parties, to render a decree, saving the rights of the absent parties. To the same effect is section 50, Jud. Code, 28 USCA § 111.

All those claiming an interest in real estate are proper parties to a suit to quiet title thereto; they are not indispensable parties, for a title may be quieted against one claimant without affecting the rights of another who is not made a party. The rights of two claimants to property may be determined inter sese, without joining all claimants. Williams v. United States, 138 U. S. 514, 11 S. Ct. 457, 34 L. Ed. 1026; Daniels v. Wagner, 237 U. S. 547, 35 S. Ct. 740, 59 L. Ed. 1102, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40; Texas Co. v. Central Fuel Oil Co. (C. C. A. 8) 194 F. 1. In Silver King Coalition Mines Co. v. Silver King C. M. Co., 204 F. 166, Ann. Cas. 1918B, 571, the Eighth Circuit Court of Appeals, speaking through Judge Walter H. Sanborn, applied the same rule to a suit on a contract of assumption. It was there held that a judgment could be rendered against a party assuming a debt without joining the original debtor, although later litigation, involving the same contract, might ensue between the original debtor and the one who assumed the debt. Actions by a beneficiary against a life insurance company, without joining the personal representative of the insured, further illustrates the principle that a suit may be maintained between two parties to a contract, without joining the third.

---

[4] Courts sometimes use "necessary" as synonymous with "indispensable."

[5] Some courts describe such parties as "necessary" in contradistinction to "indispensable."

From these authorities, it appears that while a decree cannot be entered affecting the rights of an absent party, an opinion may be handed down which will be an authority in later cases between other parties. One must be a party before the doctrine of res adjudicata is invoked against him; he need not be a party if the rule invoked is that of stare decisis. Bienville Water Supply Co. v. Mobile, 186 U. S. 212, 217, 22 S. Ct. 820, 46 L. Ed. 1132.

The Osage Tribe is not an indispensable party within these rules. The decree herein impliedly, if not expressly, saves all the rights of the Tribe. The decree below is for a money judgment against the oil lessee, and does not in any way affect the Tribe, nor leave the matter in such shape as to be inconsistent with equity and good conscience.

The Osage Tribe is a proper party. Is it in accord with the proprieties that the decree below be affirmed in the absence of the Tribe? It clearly appears from the record that the Department of the Interior, and the Osage Tribe, knew of the use of this gas for these purposes, and knew of the controversy over it. Correspondence between the Superintendent of the Osage Agency and the Commissioner of Indian Affairs, and the testimony of the chief of the oil and gas division of the Tribe, make this fact indisputable. This record discloses therefore that the gas used for repressuring and for fuel was so used with the knowledge of the lessor, without objection. There is therefore no reason of substance why the right to the gas already used, as between the only disputants—the oil and gas lessees—should not be determined. If a situation develops where the Tribe's interests are concerned—if it should claim that the use of such gas is not an efficient operation—it can be heard at any time, unaffected by this decree. That this opinion may be cited as an authority in that supposititious case does not make the Tribe an indispensable party.

There is a practical side of the matter: The controversy over the use of residue gas has gone on for several years. The Interior Department, representing the Tribe, has invited this litigation by declining to make a regulation until the courts acted. The oil and gas lessees join in urging a decision notwithstanding the absence of the lessor. The controversy is narrow in scope, has been thoroughly tried and briefed by both sides, and a comprehensive opinion written by the trial court. To send the case back for the purpose of making the lessor a party would accomplish nothing except to keep all parties in a state of uncertainty while the case went again through the courts.

The decree below is therefore, in all respects,

Affirmed.